Volume 1 of 2

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 01-3

DUSTIN JOHN HIGGS,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CR-98-520-PJM)

Argued: June 4, 2003

Decided: December 22, 2003

Before WILKINS, Chief Judge, and LUTTIG and
TRAXLER, Circuit Judges.

---

Affirmed by published opinion. Judge Traxler wrote the opinion, in
which Chief Judge Wilkins and Judge Luttig joined.

---

## COUNSEL

**ARGUED:** Timothy Joseph Sullivan, SULLIVAN & SULLIVAN,
College Park, Maryland, for Appellant. Deborah A. Johnston, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON
BRIEF:** Barbara L. Hartung, Richmond, Virginia, for Appellant.

Thomas M. DiBiagio, United States Attorney, Sandra Wilkinson, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

**OPINION**

TRAXLER, Circuit Judge:

During the early morning hours of January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found murdered in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Dustin John Higgs was subsequently convicted by a federal jury of three counts of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a) (West 2000), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.*, and three counts of kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(2) (West 2000), all of which are punishable by life imprisonment or death. Higgs was also convicted of three counts of using a firearm "during and in relation to [a] crime of violence." 18 U.S.C.A. § 924(c) (West 2000). Ultimately, Higgs received nine death sentences under the Federal Death Penalty Act of 1994, *see* 18 U.S.C.A. § 3591 - 3598 (West 2000 & Supp. 2003) (the "FDPA" or "Act"), one for each murder and kidnapping count, and a consecutive 45-year sentence for the firearm convictions. *See* 18 U.S.C.A. § 924(c)(1). On appeal, Higgs challenges his convictions and sentences on multiple grounds. Having considered all issues raised by Higgs on appeal, as well as the question of "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592," we find no reversible error. Accordingly, we affirm Higgs's convictions and the sentences of death imposed by the district court.

## I.   Background

### A.   The Murders

On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes

and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.[1]

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat." J.A. 473. In response, Higgs commented to the other two men that Jackson "do know a lot of n-----s." J.A. 474. As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh--." J.A. 474. Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f---- that, and grabbed his coat and said come on." J.A. 474. He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat,

---

[1]After he was arrested in the fall of 1998 on federal charges of illegal distribution of crack cocaine, Victor Gloria agreed to cooperate with the government in the murder case against Higgs and Haynes. Most of the facts surrounding the murders of the three women were obtained from his eyewitness testimony. However, Gloria's testimony was partially corroborated by a friend of the Jackson family and Chinn's mother, both of whom observed the girls being picked up by a man or men in a blue Mazda MPV van. Gloria ultimately pled guilty to being an accessory after the fact to the murders and was sentenced to eighty-four months incarceration with three years supervised release.

and Gloria sitting behind Higgs. Higgs drove the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore-Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." J.A. 482. After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," J.A. 485, and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. J.A. 487. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489.

At about 4:30 a.m., a motorist found the bodies of the three women strewn about the roadway and contacted the Park Police. Jackson's day planner was found at the scene with Higgs's nickname — "Bones" — and telephone number recorded in it. On another page was written "13801 'MAZDA' 769GRY" — Higgs's address number on Briarwood Drive and the tag number for his Mazda van. A .38 caliber wadcutter bullet was also found there. According to the medical examiner, Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of the head.

### B.  The Investigation

Although Higgs was almost immediately a suspect, the investigation into the murders continued for nearly three years before an arrest was made. On March 21, 1996, Park Police officers first interviewed Higgs at his apartment. At that time, Higgs acknowledged that he knew Jackson and that he may have talked to her the night before she died, but he denied that she had ever been in his apartment. Higgs told the officers that he first heard about the murders while watching the ten o'clock news on Saturday, January 27, while attending a party at the home of Phyllis Smith, who was his girlfriend at the time. Higgs also told the officers that he had immediately commented to a party guest that he thought he knew "that Tanji girl." J.A. 672. According to the chief investigator, however, the names and photographs of the three victims were not released to the media until January 28.

After the interview of Higgs was concluded, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank fraud violations. In addition to a variety of documents and cash bundles, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45 and .38 caliber weapons. Higgs was arrested on federal drug charges and, on May 12, 1997, pled guilty to possession with intent to distribute cocaine base. He was ultimately sentenced to seventeen years imprisonment for the charge. Higgs has remained in the custody of either state or federal law enforcement officials since that arrest.

After Higgs was interviewed and arrested, the Park Police turned their attention to Phyllis Smith. Smith initially provided a false alibi for Higgs on the night of the murders. She claimed that Higgs had

been with her and her family members the entire night of January 26, helping her clean her home in preparation for the party that was to be held the following night. She also instructed her family members to confirm the alibi. In April 1996, however, Smith testified before the grand jury that Higgs was only with her at 5 a.m. on January 27.

Ultimately, Smith recanted both accounts. She testified that Higgs called her when he was arrested in March 1996 and asked her to tell officials that he had been with her the entire night of January 26. She did as she was instructed, but believed at the time that she was being interviewed in connection with the drug charges that had been filed against Higgs. When Smith later learned that the questions pertained to the triple murder investigation, Higgs told her that he did not know the murdered women, but that Haynes had known them. When Smith was called before the grand jury in late 1998, she admitted her earlier lies about Higgs's whereabouts that night. Although she and several of her family members had been cleaning her home on the evening of January 26, Higgs was not with them. Nor was Higgs at her house in the early morning hours of January 27. At trial, Smith again testified that Higgs had not helped her prepare for the party that night and was not with her when she went to bed at 1:30 a.m. on January 27. Nor was he in her home when she awoke, as she routinely did, at 5 a.m. to care for her disabled son. Smith returned to bed shortly thereafter and awoke at 10:00 a.m., when she first found Higgs and Haynes present in her home. Thus, Higgs must have arrived at Smith's home sometime between 5 a.m. and 10 a.m. on the morning of January 27. Smith did confirm that Higgs and Haynes were at her house that night for the party and that the television was on during the party.

Officers also interviewed Enidsia Darby, a former girlfriend of Higgs and the mother of his son, Daquon. Darby testified that Higgs contacted her by telephone after his March 1996 arrest and told her that he had been arrested for drugs. Darby, however, had seen news reports of Higgs's arrest that contained photographs of the three murdered women and she asked Higgs about them. In response, Higgs asked Darby if she remembered that he had been with her at the hospital on the night of the murders, which was not true. When Darby visited Higgs in jail, Higgs admitted that he had been present when Haynes shot the women. He told Darby that Jackson had been invited over to his house to smoke and drink because she had been "snitching

on one of them." J.A. 759. He told her that he did not know the other two girls; "[t]hey were just for his friends." J.A. 761.

In addition to her testimony regarding Higgs's drug activities, Darby offered testimony regarding a bank fraud scheme and credit card scheme that she and Higgs had conducted in the fall of 1995. Higgs deposited checks into accounts that had been opened by Darby and Andrea Waters, one of Darby's friends. The women, in turn, would withdraw the cash and give it to Higgs. Waters was paid a portion of the money withdrawn from her account, but when the checks deposited in her account bounced and Higgs refused to return the money, she threatened to go to the police. Higgs responded with a threat to kill her. Darby also testified that, while employed in the electronics department of a retail department store, she charged merchandise for Higgs to a credit card number Higgs had given her. Months later, when Darby was contacted by the police about the matter, Higgs threatened to kill her if she identified him from the surveillance photographs.

The investigation into Higgs's possible involvement in the murders also uncovered his participation in two prior shooting incidents involving a .38 caliber weapon. The incidents were significant because the same caliber weapon had been used to murder the three women.

The first incident occurred on November 20, 1995, approximately two months before the murders. Higgs got into an argument outside the Chaconia Nightclub in Washington, D.C., and shot out the windows of a vehicle in a drive-by shooting. After Higgs's arrest on the federal drug charges and while the murder investigation was still underway, the vehicle was searched and the police recovered a .38 caliber bullet. Wondwossen Kabtamu, who was with Higgs at the time of the Chaconia shooting, testified that he drove Higgs's Mazda MPV van while Higgs did the shooting. Kabtamu threw the gun out the window after the shooting, but they returned to get it at Higgs's insistence.

Higgs was ultimately charged with the Chaconia shooting in the D.C. Superior Court. In late 1998, while housed at a D.C. jail, Higgs had a number of discussions about the Chaconia charges with Domen-

ick Williams, a fellow inmate and "jailhouse lawyer." Higgs never admitted involvement in the Chaconia shooting to Williams, but he did tell Williams "[t]hat he didn't want to plead guilty because they would try to use the gun in another case." J.A. 975. After Williams learned through a press report that Higgs was being indicted for the murders of the three women, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979. Higgs also advised Williams that he had rebuffed the authorities' attempts to strike a deal with him to cooperate against his co-defendant Haynes. When Williams advised Higgs that the authorities would likely offer Haynes a deal to cooperate if Higgs refused, Higgs told Williams "that his youngan would hold up," J.A. 984, and "that the government wouldn't offer a deal to the trigger man," J.A. 985.

Williams also testified that Higgs asked him what the chances would be "if the witness after the fact wasn't there," J.A. 982, referring to Gloria. Williams told him that "his chances would be good." J.A. 983. Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because Mel and T would be out there." J.A. 987. Melvin Grayson and "T" were former inmates at the jail where Williams and Higgs were incarcerated. Higgs told Williams "[t]hat Mel would be out there to handle anything that he needed and that he could rely on him." J.A. 992.

Williams later notified the authorities of his conversations with Higgs and produced letters that Higgs had written to him in which Higgs reported that the Chaconia case had been dismissed, that Higgs had not heard from "T", but that "Mel has been in my corner." J.A. 1011. Through visitation records, authorities learned that Melvin Grayson had visited Higgs in the D.C. jail in February 1999 and again in March 1999. The Chaconia charges against Higgs were dismissed in D.C. Superior Court in May 1999.

The second shooting incident occurred on December 10, 1995, approximately a month after the Chaconia nightclub shooting. Haynes went to the home of Rodney Simms on Cherry Lane in Laurel, Maryland, and argued with Simms about a woman. During the argument, Haynes took out a 9mm handgun and began shooting. Higgs came out from a nearby shed and also began firing shots. Haynes and Higgs were charged in Maryland state court for the shooting. Police recov-

ered 9mm and .38 caliber bullets and bullet casings from the Cherry Lane crime scene. Forensic evidence revealed that the .38 caliber bullets fired from the weapons at the Cherry Lane and Chaconia sites had five "lands and grooves," with a right twist.[2] Although forensics could not definitively conclude that the bullets had been fired from the same weapon, the .38 caliber bullets recovered from the Patuxent murder scene and the murder victims were also .38 caliber bullets shot from a gun with five lands and grooves with a right twist.

In April 1997, Higgs pled guilty to the Cherry Lane shooting and was sentenced to 18 months imprisonment. During the plea hearing, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to the facts underlying the Cherry Lane shooting, with the single exception of gratuitously asserting that he "didn't have a .38. It was the other way around." J.A. 1104.

## C.   The Indictment

On December 21, 1998, Higgs and Haynes were indicted for three counts each of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id*, kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a), and using a firearm in the commission of a crime of violence, *see* 18 U.S.C. § 924(c). On October 22, 1999, the government filed the statutorily-required notice of its intent to seek a death sentence for the murder and kidnapping charges. *See* 18 U.S.C.A. § 3593(a). On December 20, 1999, the grand jury returned a second superseding indictment, and the government filed an amended death notice on February 8, 2000.[3]

---

[2]According to the testimony, "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." J.A. 1137. Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," J.A. 1123-24, the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

[3]All references made to the indictment or death notice hereafter refer to the amended documents.

The cases were severed for trial. Haynes was tried first and convicted of first-degree murder, kidnapping, and use of a firearm during a crime of violence. During the penalty phase of Haynes's trial for the murder and kidnapping counts, however, the jury was unable to reach a unanimous verdict on the death sentence. Accordingly, on August 24, 2000, the district court sentenced Haynes to concurrent life terms for the first-degree murder and kidnapping counts and to a forty-five year consecutive sentence for the firearm offenses. His convictions and sentences were affirmed on appeal. *See United States v. Haynes*, 26 Fed. Appx. 123, 2001 WL 1459702 (4th Cir. 2001), *cert. denied*, 535 U.S. 979 (2002).

### D. The Trial

Jury selection in Higgs's trial began on September 5, 2000, and the jury returned guilty verdicts on all charges on October 11, 2000. The case then proceeded to the penalty phase. On October 26, 2000, after hearing evidence on aggravating and mitigating factors, the jury returned a sentence of death for each of the murder and kidnapping counts.

In order to impose a sentence of death under the FDPA, a jury is required to find at least one "intent" factor enumerated by Congress, *see* 18 U.S.C.A. § 3591(a)(2), and at least one statutory "aggravating" factor, *see* 18 U.S.C.A. § 3592(c). Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible. The jury must then determine the existence of any nonstatutory aggravating factors submitted to it for consideration, provided the government has given the appropriate notice of its intent to submit such additional factors, *see* 18 U.S.C.A. § 3592(c), as well as any mitigating factors, *see* 18 U.S.C.A. § 3592(a), and "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death," 18 U.S.C.A. § 3593(e).

As to all victims and offenses, the jury in Higgs's case determined that the government had proven two intent factors beyond a reasonable doubt: (1) that Higgs had "intentionally participated in . . . act[s], contemplating that the [lives] of [the victims] would be taken or intending that lethal force would be used in connection with [the vic-

tims]"; and (2) that Higgs had "intentionally and specifically engaged in . . . act[s] of violence, knowing that the act[s] created a grave risk of death to the [victims]." *See* 18 U.S.C.A. § 3591(a)(2)(C) & (D).

The jury also found that the government had proven beyond a reasonable doubt four statutory aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping), for the first-degree murder counts only, *see* 18 U.S.C.A. § 3592(c)(1); (2) that Higgs had a previous conviction of a violent felony involving a firearm, based on Higgs's guilty plea to assault and reckless endangerment for his participation in the Cherry Lane shooting, *see* 18 U.S.C.A. § 2592(c)(2); (3) that Higgs had a previous conviction for a serious federal drug offense, based on Higgs's March 1996 arrest and subsequent conviction for possession with intent to distribute cocaine base, *see* 18 U.S.C.A. § 3592(c)(12); and (4) that the crime for which he was on trial involved multiple killings in a single criminal episode, *see* 18 U.S.C.A. § 3592(c)(16). The jury found that the government had also proven two nonstatutory aggravating factors beyond a reasonable doubt: (1) that Higgs had caused harm and loss to each victim and their families, based on the effect of the offense on the victims, their personal characteristics as individual human beings, and the impact of the death upon the victims and their families ("victim impact"); and (2) that Higgs obstructed the investigation into the kidnappings and murders by tampering or attempting to tamper with evidence and witnesses ("obstruction of justice").

Members of the jury also found three mitigating factors by a preponderance of the evidence: (1) that Higgs was not the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's son (4 jurors). *See* 18 U.S.C.A. § 3592(a). However, the jury unanimously rejected three additional mitigating factors: (1) that Haynes was an equally culpable defendant who had not been sentenced to death for the murders; (2) that Higgs's family history, including the abandonment by his father and the death of his mother at a young age, influenced the direction his life had taken; and (3) that other factors in Higgs's background, record, or character or other circumstances of the offense mitigated against imposition of the death sentence.

Ultimately, the jury recommended that Higgs be sentenced to death for each death-eligible conviction and, on January 3, 2001, the district court imposed nine death sentences. The district court also imposed sentences of five years, twenty years, and twenty years for the three § 924(c) convictions, respectively, directing that the sentences be served consecutively. Additionally, the court imposed a three-year term of supervised release and directed Higgs to pay restitution of $13,687. On appeal, Higgs presents twenty separate assignments of error to his convictions and sentences, which we address in turn.

## II.   The Sufficiency of the Indictment

We first consider Higgs's claim that his capital convictions and death sentences must be vacated because the indictment failed to charge Higgs specifically with the intent factors required under 18 U.S.C.A. § 3591(a)(2) and the aggravating factors required under 18 U.S.C.A. § 3592(c) to impose a sentence of death under the FDPA. We review the legal sufficiency of an indictment de novo. *See United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003).

## A.   The Indictment Clause

The Indictment Clause of the Fifth Amendment provides, in pertinent part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. Its purpose is to ensure that a defendant's jeopardy is limited "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218 (1960). In conjunction with the notice requirement of the Sixth Amendment,[4] the Indictment Clause provides two additional protections: the right of a defendant to be notified of the charges against him through a recitation of the elements, and the right to a description of the charges that is sufficiently detailed to allow the defendant to argue that future proceedings are precluded by a previous acquittal or conviction. *See Russell v. United States*, 369 U.S. 749, 763-64 (1962); *see also Hamling*

---

[4]The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.

*v. United States*, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense"); *United States v. Carrington*, 301 F.3d 204, 209-10 (4th Cir. 2002) (same). In this case, we are presented with the question of whether Higgs's federal indictment sufficiently alleged the nine murder and kidnapping counts as death-eligible, capital offenses — an inquiry that places us squarely within the arena of *Apprendi* and its progeny. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).

In *Apprendi*, the defendant was convicted of second-degree possession of a firearm, punishable by a term of imprisonment of between five and ten years. However, he was sentenced to twelve years imprisonment under New Jersey's "hate crime" law, which authorized an enhanced sentence of between ten and twenty years if the sentencing judge found, by a preponderance of the evidence, that the crime was motivated by racial animus. The Supreme Court reversed and remanded, concluding that the Sixth Amendment mandated that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

A similar mandate flows from the Fifth Amendment's Indictment Clause: "In federal prosecutions, such facts must also be charged in the indictment." *United States v. Cotton*, 535 U.S. 625, 627 (2002); *see also United States v. Promise*, 255 F.3d 150, 156-57 (4th Cir. 2001) (en banc) (holding that, when applying *Apprendi* to a federal prosecution, a fact that increases the maximum penalty "must be treated as an element of an aggravated . . . offense, *i.e.*, charged in the indictment and proved to the jury beyond a reasonable doubt" (footnote omitted)); *id* at 157 n.6 (rejecting argument that "a fact that increases the maximum penalty must be treated as an element for purposes of some rights guaranteed by the Fifth Amendment (*e.g.* the right to a determination of guilt beyond a reasonable doubt) but not others (*e.g.*, the right to indictment by a grand jury)").

These cases stand for the settled proposition that, with the exception of the fact of a prior conviction, a defendant may not be exposed

"to a penalty *exceeding* the [statutory] maximum he would receive if punished according to the facts reflected in the jury's verdict alone." *Apprendi*, 530 U.S. at 483. In determining whether a particular fact is to be treated as an element of the offense, as opposed to a sentencing factor, "the relevant inquiry is one not of form, but of effect — does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court had occasion to consider the effect of *Apprendi*'s holding upon Arizona's capital sentencing scheme, which allowed the trial judge alone to determine the presence of aggravating factors required for imposition of the sentence of death. Overruling its prior decision in *Walton v. Arizona*, 497 U.S. 639 (1990),[5] the Court struck down the scheme, holding that the Sixth Amendment mandates that "[c]apital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact . . . must be found by a jury beyond a reasonable doubt. A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 602 (internal citation, quotation marks and alterations omitted). "Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense," the Court held that "the Sixth Amendment requires that they be found by a jury." *Id.* at 609 (internal quotation marks omitted).

The Arizona sentencing scheme at issue in *Ring* did not directly implicate the Fifth Amendment Indictment Clause. *See Ring*, 536 U.S. at 597 n.4 (noting that Ring "does not contend that his indictment was constitutionally defective" and that "the Fourteenth Amend-

---

[5]In *Walton v. Arizona*, the Court had held that Arizona's sentencing scheme did not run afoul of the Sixth Amendment because the aggravating factors were not "element[s] of the offense of capital murder." 497 U.S. 639, 649 (1990). The *Ring* Court concluded that this holding was "irreconcilable" with *Apprendi*'s reasoning. *See Ring v. Arizona*, 536 U.S. 584, 589 (2002).

ment has not been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury" (internal quotation marks and ellipsis omitted)). Thus, the Supreme Court has not yet addressed the precise issue of whether, and to what extent, the Indictment Clause requires that the intent and aggravating factors be charged in the indictment. Higgs asserts that the principles of *Apprendi* and *Ring* dictate that any factor required to be submitted to the jury must be included in the indictment. We agree.

Higgs's indictment charged him with three counts each of premeditated murder, murder committed in the perpetration of a kidnapping, and kidnapping resulting in death. Like the Arizona criminal statutes at issue in *Ring*, the federal statutes setting forth these offenses provide that the offender shall be punished by *either* death *or* life imprisonment.[6]

---

[6]Section 1111 of Title 18 provides as follows:

(a)   Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed is murder in the first degree.

. . . .

(b)   Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree *shall be punished by death or by imprisonment for life*.

18 U.S.C.A. § 1111 (emphasis added). Section 1201 of Title 18 provides that:

(a)   Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when —

A defendant does not become *eligible* for the death penalty, however, unless the jury finds at least one statutory intent factor, *see* 18 U.S.C.A. § 3591(a)(2), and at least one statutory aggravating factor, *see* 18 U.S.C.A. § 3592(c). *See Jones v. United States*, 527 U.S. 373, 376-377 (1999); *see also* 18 U.S.C.A. § 3593. Because a defendant may be sentenced only to life imprisonment unless the jury finds the existence of at least one intent factor and one statutory aggravating factor, we have little trouble concluding that such factors increase the penalty for the crimes of first-degree murder and kidnapping resulting in death beyond the otherwise maximum sentence of life imprisonment. Accordingly, with the exception of the fact of prior convictions, those intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under the FDPA are the functional equivalent of elements of the capital offenses and must be charged in the indictment, submitted to the petit jury, and proved beyond a reasonable doubt.

We reject, however, Higgs's claim that the Indictment Clause requires that nonstatutory aggravators relied upon by the government at trial be included in the indictment. The finding of a nonstatutory aggravator alone will not support imposition of the death penalty. Rather, the purpose of nonstatutory aggravators is to aid the factfinder in selecting the appropriate sentence from the available options, *i.e.*, death or life imprisonment. Thus, "the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967,

---

. . .

   (2)   any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

. . .

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, *shall be punished by death or life imprisonment.*

18 U.S.C.A. § 1201(a)(2) (emphasis added).

972 (1994) (internal quotation marks omitted); *see also Jones*, 527 U.S. at 376-379 (discussing the FDPA decisionmaking process and the distinction between the "eligibility" decision and the "selection" decision); *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983) (discussing difference between "eligibility" and "selection" factors); *cf. United States v. Tipton*, 90 F.3d 861, 893-94 (4th Cir. 1996) (discussing the decisionmaking process under the analogous death sentencing proceedings of 21 U.S.C. § 848). Because nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment.

### B.   The Indictment for Capital Murder

We now turn to the issue of whether Higgs's indictment for the capital crimes was in fact constitutionally defective under the Indictment Clause because it failed to allege the statutory intent and aggravating factors relied upon by the government.

### 1.   The Intent Factors

We begin with the intent factors of 18 U.S.C.A. § 3591(a)(2). In returning the verdict of death for each of the murder and kidnapping charges, the jury found that the government had proven two such factors beyond a reasonable doubt — intentional acts to take a life and intentional acts of violence creating a grave risk of death. *See* 18 U.S.C.A. § 3591(a)(2). In the indictment, Higgs is charged with killing each of the three women, "by shooting [them] with a firearm, willfully, deliberately, maliciously, and with premeditation," and "in the perpetration of . . . kidnapping." J.A. 135-36, 140-41, 145-46. Hence, the indictment sufficiently alleged that Higgs engaged in intentional acts to take the lives of the three women and intentional acts of violence that created a grave risk of death to the three women.

### 2.   The Statutory Aggravating Factors

The question of whether the indictment sufficiently alleged the statutory aggravating factor required under 18 U.S.C.A. § 3592(c) to impose a death sentence is more difficult to answer.

We reject at the outset Higgs's contention that the indictment failed to sufficiently charge each of the capital murder and kidnapping counts because it failed to allege *all* of the statutory aggravating factors which were ultimately found by the petit jury. The FDPA sets forth sixteen potentially aggravating factors for a homicide conviction. *See* 18 U.S.C.A. § 3592(c). However, only one such aggravating factor need be found for the jury to recommend a sentence of death. *See* 18 U.S.C.A. § 3593(d) & (e). Because only one statutory aggravating factor is required under the Act to render a defendant death-eligible, we hold that the indictment need only allege one such aggravating factor. *See United States v. Jackson*, 327 F.3d 273, 287 (4th Cir. 2003) (Niemeyer, J., concurring) ("[W]hen the death penalty is dependent on a finding of an aggravated offense, then the core statutory elements of that offense, as well as at least one aggravating factor, must be charged in the indictment and found by the jury."). There is no requirement that the indictment allege *all* of the factors that might be weighed by the jury when deciding whether to impose a death sentence. So long as one statutory aggravating factor is alleged in the indictment and the petit jury finds that statutory aggravating factor to exist, the indictment is not defective as to the capital offense charged. *See id.* The elements of the offense of conviction have been charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. Any additional statutory or nonstatutory aggravating factors may be fairly viewed as sentencing considerations.[7]

With regard to the six counts of murder and the three counts of kidnapping resulting in death with which Higgs was charged, the petit jury found the existence of three statutory aggravating factors: (1) multiple killings in a single criminal episode under 18 U.S.C.A. § 3592(c)(16); (2) previous conviction of a violent felony involving a firearm under § 3592(c)(2), based on Higgs's guilty plea to assault and reckless endangerment arising from the Cherry Lane shooting; and (3) previous conviction for a serious federal drug offense under § 3592(c)(12), based on Higgs's federal conviction for possession

---

[7]This is not to say, of course, that such a limited indictment would be the better course. In order to render the offense death-eligible, the petit jury must find the statutory aggravating factor relied upon by the government in the indictment. Thus, the better practice would obviously be to allege *all* potential statutory aggravating circumstances in the indictment.

with intent to distribute cocaine base. With regard to the six first-degree murder counts, the jury also found that the government had proven, as an additional statutory aggravating factor, that the deaths occurred during the commission of another crime, specifically, a kidnapping. *See* 18 U.S.C.A. § 3592(c)(1).

The government argues that the indictment is not defective because it alleges facts which, if found by the jury, support two of these § 3592(c) aggravating factors — multiple killings in a single criminal episode and death during the commission of a kidnapping. In the alternative, the government argues that the indictment is not defective because the Fifth Amendment does not require that the prior conviction aggravators be alleged in the indictment.

For the reasons that follow, we agree that the indictment was not constitutionally deficient. However, the multiple killings aggravator, while adequately alleged in the indictment, cannot serve as the requisite statutory aggravator for any of the charges because it was not a statutory aggravator at the time the murders were committed. Rather, the indictment is not defective because the "other crime" aggravator was adequately alleged in the indictment to support a death sentence for the six first-degree murder charges and because the prior conviction aggravators, which support a death sentence for all charges, were not required to be alleged in the indictment at all.

### a.   The "Multiple Killings" Aggravator

We begin by rejecting the government's contention that the indictment is not defective as to either the § 1111(a) murder or § 1201(a) kidnapping charges because it alleges facts supporting the statutory aggravator of multiple killings in a single criminal episode. *See* 18 U.S.C.A. § 3592(c)(16). Although the indictment sufficiently alleged the aggravating factor, "multiple killings" was not added to the FDPA as a *statutory* aggravating factor until April 1996, three months after the murders were committed.

Article 1, § 9 of the United States Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." Pursuant to the Clause, "'any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more bur-

densome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.'" *Dobbert v. Florida*, 432 U.S. 282, 292 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925)). In short, the Ex Post Facto Clause prohibits "laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." *California Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (internal quotation marks omitted). A new law may not alter the elements of the offense or the quantum of punishment, nor may it deprive the defendant of a defense to which he would otherwise be entitled. *See id.*; *Carmell v. Texas*, 529 U.S. 513, 521-525 (2000).

Although the prohibition against the use of ex post facto laws "does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed," *Dobbert*, 432 U.S. at 293 (internal quotation marks omitted), it does "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). The Clause operates to "forbid[ ] the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was *prescribed* when the crime was consummated." *Id.* at 30 (emphasis added).

In view of the Supreme Court's jurisprudence in *Apprendi* and *Ring*, we agree that the government cannot solely rely upon "multiple killings" as a statutory aggravating factor for a crime committed before its adoption without violating the Ex Post Facto Clause. With the exception of the prior conviction aggravators, statutory aggravating factors which render an offense of conviction death-eligible clearly "increase the punishment for criminal acts." *Morales*, 514 U.S. at 504. Accordingly, we hold that the "multiple killings" aggravator cannot act as the sole statutory aggravator which rendered these murders death-eligible.

b.　The "Other Crime" Aggravator

The indictment is not defective as to the first-degree murder charges because it sufficiently alleged the "death during commission

of another crime" aggravator. The indictment specifically alleges that Higgs killed the three women "in the perpetration of, and attempted perpetration of a felony, to wit, kidnapping," J.A. 136, 141, 146, and charges further that Higgs "did knowingly, willfully and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, carry away and hold [the women] for a reason which was of benefit to [him]." J.A. 138, 143, 148. Because the indictment charges facts supporting at least one aggravating factor, it is not defective as to the six capital murder counts charged under § 1111(a). This aggravator cannot, however, suffice to render the indictment sufficient for purposes of the three capital counts for kidnapping resulting in death charged under § 1201(a). Even if we assume that the statutory aggravator could have been submitted in support of the kidnapping counts, it was only submitted to the jury in connection with the § 1111(a) first-degree murder counts.

### c. The Prior Conviction Aggravators

This leaves us with the government's argument that the indictment is not defective as to either the first-degree murder counts or the kidnapping-resulting-in-death counts because both categories of crimes carry the sentence of death as the statutory maximum and because two of the statutory aggravators found by the jury — Higgs's prior conviction for a violent felony involving a firearm and Higgs's prior conviction for a serious federal drug offense — fall within the *Apprendi* and *Almendarez-Torres* exception for prior convictions. *See Apprendi*, 530 U.S. at 490; *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998). In a nutshell, the government contends that the indictment is not defective because these "prior conviction" aggravators, both of which were found by the jury and either of which rendered the offenses death eligible, are not required to be alleged in the indictment to authorize imposition of the maximum penalty of death. We agree.

In *Almendarez-Torres*, the Supreme Court was squarely presented with the question of whether a federal indictment must allege the fact of a prior conviction to expose a defendant to an enhanced sentence. Under 8 U.S.C.A. § 1326(a), a deported alien who returned to the United States without special permission was subject to imprisonment for up to two years. Under subsection (b) of the same statute, how-

ever, such a deported alien could be imprisoned for up to twenty years "if the initial deportation was subsequent to a conviction for commission of an aggravated felony." *Almendarez-Torres*, 523 U.S. at 226 (internal quotation marks omitted). As framed by the Court, the issue was

> whether th[e] latter provision defines a separate crime or simply authorizes an enhanced penalty. If the former, *i.e.*, if it constitutes a separate crime, then the Government must write an indictment that mentions the additional element, namely, a prior aggravated felony conviction. If the latter, *i.e.*, if the provision simply authorizes an enhanced sentence when an offender also has an earlier conviction, then the indictment need not mention that fact, for the fact of an earlier conviction is not an element of the present crime.

*Id*. at 226. The court held that subsection (b) was "a penalty provision, which simply authorizes a court to increase the sentence for a recidivist. It does not define a separate crime. Consequently, neither the statute nor the Constitution required the Government to charge the factor that it mentions, an earlier conviction, in the indictment." *Id.* at 226-27.

The distinction between prior convictions and other facts that might expand a penalty range, first made in *Almendarez-Torres*, was addressed by the Court again in *Jones v. United States*, 526 U.S. 227 (1999). In the wake of its recognition of the constitutional concerns raised by the "diminishment of the jury's significance by removing control over facts determining a statutory sentencing range," the Court reiterated that *Almendarez-Torres* "stands for the proposition that not *every* fact expanding a penalty range must be stated in a felony indictment." *Jones*, 526 U.S. at 248 (emphasis added). The Court explained:

> [T]he precise holding [in *Almendarez-Torres*] that recidivism increasing the maximum penalty need not be so charged . . . rested in substantial part on the tradition of regarding recidivism as a sentencing factor, not as an element to be set out in the indictment. The Court's repeated emphasis on the distinctive significance of recidivism leaves

no question that the Court regarded that fact as potentially distinguishable for constitutional purposes from other facts that might extend the range of possible sentencing. *See* [523 U.S.] at 230 ("At the outset, we note that the relevant statutory subject matter is recidivism"); *ibid.* ("With recidivism as the subject matter in mind, we turn to the statute's language"); *id.* at 243 ("First, the sentencing factor at issue here — recidivism — is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"); *id.* at 245 (distinguishing *McMillan [v. Pennsylvania*, 477 U.S. 79 (1986)] "in light of the particular sentencing factor at issue in this case — recidivism"). One basis for that possible constitutional distinctiveness is not hard to see: unlike virtually any other consideration used to enlarge the possible penalty for an offense, . . . a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees.

*Id.* at 248-249. And, in *Apprendi*, the Court again distinguished the recidivism at issue in *Almendarez-Torres* from the "hate crime" enhancer before it:

Whereas recidivism does not relate to the commission of the offense itself, New Jersey's biased purpose inquiry goes precisely to what happened in the commission of the offense. Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

530 U.S. at 496 (citation and internal quotation marks omitted); *see also id.* at 488 (noting that "*Almendarez-Torres* turned heavily upon the fact that the additional sentence to which the defendant was subject was the prior commission of a serious crime" and explaining that "[b]oth the certainty that procedural safeguards attached to any 'fact' of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that fact in his case, mitigated the due pro-

cess and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a fact increasing punishment beyond the maximum of the statutory range." (internal quotation marks omitted)).

Higgs acknowledges the Supreme Court's recidivism exception to the *Apprendi* mandate, but asserts that the Court's holding in *Ring* has placed on shaky ground the *Almendarez-Torres* proposition that prior convictions that increase the maximum penalty need not be alleged in the indictment, much like the defendant in *Ring* alleged that *Walton*'s holding was irreconcilable with *Apprendi*'s reasoning. That may or may not be so, but we are not at liberty to conclude that *Almendarez-Torres* is irreconcilable with *Ring* and grant him relief. Nor would we do so in view of the fact that the *Ring* Court specifically reserved the question of whether a judge may find the fact of prior convictions to be an aggravating circumstance in the death penalty context:

> Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence.

*Ring*, 536 U.S. at 597 n.4. Until the Supreme Court overrules *Almendarez-Torres*, we are bound to follow its holding. The indictment against Higgs alleged crimes for first-degree murder and kidnapping resulting in death, all of which authorized a sentence of life imprisonment or death. By virtue of the FDPA, life imprisonment is the maximum sentence that may be imposed *unless* the facts support a finding of at least one enumerated statutory aggravating factor. However, while statutory aggravators must be alleged in the indictment, submitted to the jury, and proven beyond a reasonable doubt, current Supreme Court jurisprudence excepts from this mandate the fact of a prior conviction. The Fifth Amendment Indictment Clause does not require an indictment to allege prior convictions that expose a defendant to an enhanced penalty.

### C.   Harmless Error

Even assuming that the indictment was defective because it failed to allege the requisite statutory aggravating factor or factors, Higgs would not be entitled to have his convictions or sentences overturned.

It has long been "recognized that most constitutional errors can be harmless." *See Neder v. United States*, 527 U.S. 1, 8 (1999) (internal quotation marks omitted); *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (noting the settled "principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt"); Fed. R. Crim. P. 52(a) (providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"). To determine whether a constitutional error is harmless, we ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15 (internal quotation marks omitted). Higgs contends that such a "harmless error" inquiry is inappropriate because the indictment's failure to charge the aggravating factors ultimately relied upon by the jury to impose a sentence of death is a structural error that mandates summary reversal of his capital convictions. We disagree.

Unlike the vast majority of trial errors which are reviewed for harmlessness, structural errors are conclusively presumed to affect the substantial rights of the defendant because they "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence. . . and no criminal punishment may be regarded as fundamentally fair.'" *Neder*, 527 U.S. at 8-9 (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). The Supreme Court has repeatedly stated that most constitutional errors are not structural and may, instead, be reviewed for harmlessness. *See, e.g., id.* at 8. "If the defendant had counsel and was tried by an impartial adjudicator, there is a *strong* presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis." *Id.* (alterations and internal quotation marks omitted) (emphasis added). The "very limited class of cases" in which the Court has found structural error are those in which there was "a defect affecting the framework within which the trial proceed-

[ed], rather than simply an error in the trial process itself." *Id.* (internal quotation marks omitted). Such defects include such things as the failure to honor the core principle of proof beyond a reasonable doubt, the complete deprivation of counsel, the denial of the right to self-representation at trial, a biased trial judge, and the failure to preserve open and public trials. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993); *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991); *McKaskle v. Wiggins*, 465 U.S. 168 (1984); *Waller v. Georgia*, 467 U.S. 39 (1984), *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Tumey v. Ohio*, 273 U.S. 510 (1927).

As correctly pointed out by Higgs, the Supreme Court has thus far found two grand jury errors to be structural — racial discrimination in the selection of grand jurors, *see Vasquez v. Hillery*, 474 U.S. 254, 260-64 (1986), and sex discrimination in the selection of grand jurors, *see Ballard v. United States*, 329 U.S. 187, 195-96 (1946). However, only a month after *Vasquez* was decided, the Supreme Court found that a procedural error in a grand jury proceeding — allowing two witnesses to be in the grand jury room at the same time — was subject to harmless error review. *See United States v. Mechanik*, 475 U.S. 66, 70-71 (1986). The Court found the error harmless in view of the subsequent jury verdict. Although the error

> had the theoretical potential to affect the grand jury's determination whether to indict [the defendants] . . . the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70. The Court rejected the argument that an indictment error could not be held harmless on the basis of evidence presented at trial, reasoning that "even if this argument were accepted, there is no simple way after the verdict to restore the defendant to the position in which he would have been had the indictment been dismissed before trial." *Id.* at 71. In light of this fact, the Court saw "no reason not to

apply" the general rule "that errors not affecting substantial rights shall be disregarded." *Id.*

The *Mechanik* Court also distinguished *Vasquez*, noting that the rationale of the *Vasquez* decision had "little force outside the context of racial discrimination in the composition of the grand jury," where automatic reversal was called for by the perniciousness of the problem and the impracticability of other remedies. *Id.* at 70 n.1. "[T]he societal interest in deterring" the error before it, the Court held, "d[id] not rise to the level of [society's] interest in deterring racial discrimination." *Id.*

Most recently, in *United States v. Cotton*, the Supreme Court was presented with a conceded indictment error; *i.e.*, the indictment did not allege the drug quantity that increased the statutory maximum sentence as required by *Apprendi* and *Jones*. Although the court declined to explicitly resolve the question of whether an indictment error was structural or subject to harmless error review, the Court did apply the plain error test and, having assumed that the defendant could establish that the error affected his substantial rights, held that "the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." 535 U.S. at 632-33.

The statements of the Supreme Court in *Mechanik* and *Cotton* indicate that it is far from settled under Supreme Court precedent that indictment errors are structural. Indeed, we think it more likely that this is not the case, given the Court's reluctance to identify new structural errors. *Cf. Mitchell v. Esparza*, 124 S. Ct. 7, 11-12 (2003) (per curiam) (holding that state court's determination that failure to charge aggravating factor for capital murder in indictment and to submit it to the jury was subject to harmless error review was not "contrary to," or "an unreasonable application of" its precedents governing harmless error review); *id.* at 11 ("We cannot say that because the violation occurred in the context of a capital sentencing proceeding that our precedent [on harmless error review] requires [an] opposite result.").

In the end, we are persuaded by the reasoning of our sister circuits, which have held that indictment error, and in particular the failure of an indictment to allege an element of a charged offense, may be reviewed for harmlessness:

> [T]he Court in *Neder* held that the failure to instruct the jury on every element of an offense "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder*, 527 U.S. at 9 (emphasis in original). To us, a defendant's right to have a petit jury find each element of the charged offense beyond a reasonable doubt is no less important than a defendant's right to have each element of the same offense presented to the grand jury. If denial of the former right is subject to harmless error analysis, we believe denial of the latter right must be as well.

*United States v. Prentiss*, 256 F.3d. 971, 984 (10th Cir. 2001) (en banc) (per curiam); *see also United States v. Mojica-Baez*, 229 F.3d 292, 311 (1st Cir. 2000) (holding that the distinction between the trial judge's failure in *Neder* "to submit an element of the offense to the petit jury at trial" and "the failure to present an element to the grand jury to secure an indictment" on the offense is not "significant where the indictment provided the defendant with fair notice of the charges against him").

In this case, Higgs was charged with nine first-degree murder and felony murder charges, all of which carried a penalty of life imprisonment or death. Even if we assume that all of the aggravators relied upon by the jury to impose the sentence of death (including prior convictions) are to be treated as elements of the offenses that should have been alleged in the indictment, the indictment would only be defective because it failed to allege those essential elements of the offenses, not because it charged an offense different from the one for which he was ultimately convicted and sentenced. Such error is harmless because "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15 (internal quotation marks omitted).

First, the primary function of an indictment is to notify the defendant of the charges against him and provide a sufficient basis upon which the defendant can plead the defense of former jeopardy. *See Russell*, 369 U.S. at 763-64; *Carrington*, 301 F.3d at 209-10; *see also Mojica-Baez*, 229 F.3d at 310 (noting that the most serious harm that can result from a defective indictment "may be when a defendant is

without fair notice of the charges against him"). These purposes were served by the indictment's reference to statutes for which death is the maximum possible penalty and the government's notice of its intent to seek the death penalty, which notified Higgs of *all* of the aggravating factors the government would seek to prove at trial to obtain that maximum sentence. Thus, while the indictment failed to specify every aggravating circumstance that the prosecutor intended to pursue in support of the statutorily-authorized penalty of death, Higgs was provided with fair notice of the charges against him, the prosecutor's intent to pursue the sentence of death, and each and every statutory and nonstatutory aggravating circumstance that the prosecutor intended to prove at trial.

Second, the petit jury's finding of all the aggravating factors beyond a reasonable doubt demonstrates that Higgs was not prejudiced by the lack of an independent judgment of the grand jury. *See Mechanik*, 475 U.S. at 70 (holding grand jury error harmless in light of subsequent finding of guilt beyond a reasonable doubt by petit jury); *cf. United States v. Patterson*, 241 F.3d 912, 914 (7th Cir.) (per curiam) ("Once the petit jury finds beyond a reasonable doubt . . . that a particular [fact] was involved, we can be confident in retrospect that the grand jury (which acts under a lower burden of persuasion) would have reached the same conclusion."), *cert. denied*, 122 S. Ct. 124 (2001).

Finally, the record evidence of Higgs's previous convictions for a violent felony involving a firearm and for a serious federal drug offense, either of which would have been sufficient to meet the "aggravating factor" requirement, was not contested. *Cf. Neder*, 527 U.S. at 16 (holding that harmlessness test was met when the record evidence supporting the element was "so overwhelming" that the defendant had not even contested it); *id.* at 19 ("[W]here a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.").

In sum, we hold that any alleged indictment error was harmless beyond a reasonable doubt. The indictment's failure to specify every aggravating factor "did not necessarily render the indictment unfair or

make it an unreliable vehicle with which to commence the proceedings in this case." *Mojica-Baez*, 229 F.3d at 312. Nor can we say the indictment error contributed to the verdict ultimately obtained from the petit jury.

### III.   Change of Venue

Prior to his trial, Higgs filed a motion for a change of venue from Greenbelt, Maryland, to Baltimore, Maryland, based on the extensive media coverage of the case. The district court denied the motion. On appeal, Higgs argues that he was denied his constitutional right to a fair and impartial jury in violation of the Fifth and Sixth Amendments because the media coverage rendered a fair trial in the Greenbelt Division impossible. We review the district court's denial of Higgs's motion for a change of venue for abuse of discretion. *See United States v. Bailey*, 112 F.3d 758, 770 (4th Cir. 1997).

As a general premise, a change of venue is warranted when the court is satisfied that there exists in the district where the prosecution is pending "so great a prejudice against the defendant" that "the defendant cannot obtain a fair and impartial trial." Fed. R. Crim. P. 21(a). The determination of whether a change of venue is required as a result of pretrial publicity involves a two-step process. *See United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991). First, the district court must determine "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted," and, if so, grant a change of venue prior to jury selection. *Id.* However, "[o]nly in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself." *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987); *see also United States v. Jones*, 542 F.2d 186, 193) (4th Cir. 1976) (noting that cases in which prejudice will be presumed will be rare). Ordinarily, the trial court must "conduct[ ] a *voir dire* of prospective jurors to determine if actual prejudice exists." *Bakker*, 925 F.2d at 732. If "*voir dire* reveals that an impartial jury cannot be impanelled," the trial court should then grant the motion. *Id.*

Higgs first asserts that he satisfied the presumed prejudice test based upon the volume of news media coverage that occurred during the four-plus years that elapsed between the time of the murders and

the time that jury selection began in his case. In particular, he points to the fact that Higgs and Haynes were the first federal defendants in the Greenbelt Division to face the death penalty, that Haynes had just been tried and convicted on the same murder charges, and that news stories released just prior to his trial reported that Haynes claimed that Higgs ordered the murders and that both men were local drug dealers serving federal sentences. As evidence of the volume of coverage, he points to the fact that 130 prospective jurors and seven of those ultimately seated had read or heard about the case prior to the trial.

Although Higgs is correct that there was a large amount of media coverage when the murders occurred in late January 1996, the district court did not abuse its discretion in ruling that the coverage did not rise to the level necessary to require a change of venue. Here, although the coverage was not entirely dispassionate and factual, neither was it highly inflammatory. *See United States v. De La Vega*, 913 F.2d 861, 864 (11th Cir. 1990) (finding "several hundred news reports" over two years which were "largely dispassionate" but "occasionally punctuated by editorial remarks" insufficient to establish presumed prejudice). In addition, the bulk of the coverage occurred contemporaneously with the murders, four years before Higgs's trial. There was additional coverage on the one-year anniversary of the murders and when the indictment was issued. However, there was no evidence of any media coverage between the time of the indictment and the November 15, 1999, initial hearing on the motion for a change of venue.

Higgs also cannot establish presumed prejudice based on the additional coverage that occurred around the time of Haynes's trial. The additional coverage was not extensive and, as found by the district court, was more factual than inflammatory. *See Bakker*, 925 F.2d at 732 (holding that extensive initial coverage of alleged crime a few years earlier coupled with more recent coverage of criminal proceedings which was factual was insufficient to establish presumed prejudice).

We are also unpersuaded by Higgs's assertion that he demonstrated actual prejudice because *voir dire* revealed that the majority of the prospective jurors knew about the case and because several prospective jurors stated that they had formed an opinion about the case based

on the media reports. Under the second prong of *Bailey*, the district court may order a change of venue if *voir dire* reveals that an impartial jury cannot be impaneled due to actual prejudice of the venire members. To demonstrate actual prejudice, the defendant must show that a prospective juror has formed an pre-trial opinion that the defendant is guilty and cannot "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

The *voir dire* of the jury members failed to demonstrate that an impartial jury could not be seated. Of the seated members of the jury, seven acknowledged that they had heard of the case. However, it is a long-settled proposition that mere knowledge of a case is insufficient to support a finding of actual prejudice. *See Irvin*, 366 U.S. at 722-23; *Murphy v. Florida*, 421 U.S. 794, 799-80 (1975) ("Qualified jurors need not . . . be totally ignorant of the facts and issues involved."). During *voir dire*, the district court excused those prospective jurors who had expressed an inability to be fair and impartial. Each of the seven seated jurors who had some knowledge of the case stated that they could decide the case based solely on the evidence presented at trial. Accordingly, we affirm the district court's denial of Higgs's motion for a change of venue.

## IV.   Guilt Phase Challenges

We next address Higgs's challenges to various district court rulings during the guilt phase of his trial.

### A.   The Telephone Conversation between Higgs and Grayson

Higgs contends that his rights under the Fifth and Sixth Amendments were violated by the district court's admission of a taped telephone conversation that took place between Higgs and his former D.C. jailhouse friend, Melvin Grayson, as well as the district court's instruction to the jury that Higgs's silence during the conversation could constitute an admission. Because Higgs did not object to the admission of the tape recording at trial, we review the admission of the evidence for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732-35 (1993). We review the district court's decision to give a particular instruction and its content for abuse of

discretion. *See United States v. Stotts*, 113 F.3d 493, 496 (4th Cir. 1997). We review jury instructions to determine "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990). An error in the jury instruction will warrant reversal of the conviction only if "the error is prejudicial based on a review of the record as a whole." *United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997).

On May 20, 2000, after Higgs was transferred to a federal penitentiary, he placed a telephone call to Grayson. During the conversation, which was recorded pursuant to prison policy, Higgs and Grayson discussed Haynes's conviction for the murders, which had been handed down the previous day. Higgs commented that Haynes's attorney had blamed the murders on Higgs and complained that the lawyer "got the whole joint twisted." J.A. 1337. Grayson subsequently read Higgs a newspaper article reporting Haynes's conviction, including the report that Haynes had claimed that he only shot the women because he was afraid of Higgs. Higgs did not respond to Grayson's reading of the article.

Higgs did not object to the admission of the tape recording at trial. At the conclusion of the trial, the district court instructed the jury that Higgs's silence during Grayson's reading of the newspaper article could be considered an admission of guilt by Higgs under Federal Rule of Evidence 801(d)(2)(B):

> Now there has been testimony that while incarcerated, the defendant was silent when statements were made in his presence implicating him in the commission of the acts charged in the indictment.
>
> If you find that the defendant was actually present and heard the statements and understood them, then you may consider the defendant's silence as an admission of their truth if you find, in accordance with your common sense and experience, that the defendant would have denied the statements had they been untrue.
>
> However, you should bear in mind that some people will remain silent even if they are innocent. For example, an

inmate who knows that his telephone calls will be monitored or recorded may choose to remain silent.

J.A. 1282-83. Higgs unsuccessfully objected to the 801(d)(2)(B) charge.

Under Rule 801(d)(2)(B), "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." "A party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence." *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001).

When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.

*Id.* at 383 (quoting *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996)).

We find no error in the district court's decision to admit the recorded telephone conversation between Higgs and Grayson. Higgs and Grayson were freely discussing the trial of Haynes and the accusations made against Higgs in the course of those proceedings. Higgs gave no indication that he was being silent in the face of those accusations because he knew he was being recorded. On the contrary, the recording demonstrates that Higgs not only heard and understood the statements made by Grayson, but commented upon them to some extent. Thus, we are satisfied that the district court appropriately allowed the jury the opportunity to conclude, as instructed, either that Higgs would have made his disagreement known if such existed or that he chose to remain silent because of the knowledge that he was being recorded. In view of the district court's instruction, which correctly stated the law, the district court did not abuse its discretion in admitting the evidence and charging the jury that Higgs's silence could be considered an admission under Rule 801(d)(2)(B).

### B.  Admission of Evidence of the Chaconia Shooting and the Bank Fraud Scheme

Higgs also contends that the district court's admission of evidence of the Chaconia nightclub shooting and the bank fraud scheme that Higgs carried out with Darby and Waters violated his rights to due process and a fair trial. At the conclusion of the government's case, the defense presented no witnesses and Higgs did not testify. With regard to the government's evidence of unrelated offenses, the court charged the jury as follows:

> Now there has been evidence received during the trial that the defendant engaged in a shooting outside the Chaconia's Nightclub in November 1995, also a shooting at Cherry Lane in December 1995, bank fraud, firearm possession and also drug activity. The defendant is not on trial for these matters. They may not be used to show the bad character of the defendant on prior occasions.

> Accordingly, you may not consider the evidence of these acts as substitute for proof that he committed the crimes charged in this case, nor may you consider this evidence as proof that the defendant has a criminal personality, bad character or propensity to commit crimes.

> The evidence . . . may, however, be considered to establish the defendant's identity, his motive, intent, and knowledge on January 27, 1996. The evidence may also be considered by you to show, one, the defendant's relationship with Willis Mark Haynes and with Victor Gloria and with Wondwossen Kabtamu, and with Enidsia Darby in criminal activity, and it may also be evidence of defendant's ownership of a firearm.

J.A. 1296-97. Higgs asserts that the district court abused its discretion in admitting this evidence during the guilt phase because it was neither intrinsic to the crimes charged nor admissible under Rule 404(b).

Reviewing the district court's admission of this evidence for an abuse of discretion, *see United States v. Chin*, 83 F.3d 83, 87 (4th Cir.

1996), we find none. "[W]here testimony is admitted as to acts intrinsic to the crime charged, and is not admitted solely to demonstrate bad character, it is admissible." *Id.* at 88. "Evidence of uncharged conduct is not considered evidence of other crimes where it is necessary to complete the story of the crime on trial." *United States v. Stitt*, 250 F.3d 878, 888 (4th Cir. 2001) (internal quotation marks omitted). "Evidence of other crimes, wrongs, or acts" that is not intrinsic to the crime may still be admissible if it demonstrates "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Crim. P. 404(b). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (internal quotation marks omitted) (emphasis added). Specifically, the evidence is admissible if (1) it is "relevant to an issue, such as an element of an offense, and [is not] offered to establish the general character of the defendant"; (2) it is "necessary in the sense that it is probative of an essential claim or an element of the offense"; (3) it is reliable; and (4) its "probative value [is not] substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process." *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).

### 1. The Chaconia Shooting

The shooting at the Chaconia nightclub in Washington, D.C., took place approximately two months before the murders. According to the testimony of Wondwossen Kabtamu, Higgs got into an argument with another man and, as Kabtamu was driving away in Higgs's van, Higgs fired several shots at another vehicle with a .38 caliber handgun. According to the testimony of Domenick Williams, with whom Higgs was housed at the D.C. jail while awaiting trial on the Chaconia charges, Higgs expressed great reluctance to plead guilty to the Chaconia charges "because they would try to use the gun in another case." J.A. 975. After Williams learned that Higgs was being indicted for the murders of the three women in this case, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979.

The victims in the case before us were indeed murdered with a .38 caliber weapon. The bullet recovered from the Chaconia shooting was

forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same rifling characteristics — five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon. *See United States v. Grimmond*, 137 F.3d 823, 831-32 (4th Cir. 1998) (upholding admission of prior shooting incidents to establish the defendant's possession of a firearm). In addition, the evidence was admissible under Rule 404(b) as it and the Cherry Lane evidence placed the murder weapon, which was disposed of in the Anacostia River and never found, in Higgs's hand a short time before the murders and, therefore, served the necessary function of proving his identity as one of the murderers and his use of the firearm in connection with the murders. Consequently, we hold the district court did not abuse its discretion in ruling that the evidence was admissible, nor in ruling that its probative value outweighed its prejudicial effect under Rule 403.

### 2.  The Bank Fraud Scheme

Higgs also challenges the district court's admission of Darby's testimony about the unrelated bank fraud scheme that she and Waters had engaged in with Higgs. In particular, Higgs points to the death threats that ensued when authorities began to look into the matter and Higgs became concerned that the women might implicate him in the scheme. The district court admitted the evidence after concluding that it demonstrated a possible motive for the murders, and Higgs's *modus operadi* of issuing death threats to those that might be inclined to "snitch" on him.

We find no abuse of discretion. Gloria testified that just prior to the murders, Higgs and Jackson violently argued at Higgs's apartment, prompting Jackson to retrieve a knife from the kitchen. When the women left, Higgs made the comment to Gloria and Haynes that Jackson "do know a lot of n——-s," and expressed anger that she appeared to be "writing down [his] sh—." J.A. 474. Darby testified that Higgs told her shortly after his arrest that Jackson had been

invited to his apartment because she had been "snitching on one of them," J.A. 759, suggesting that retaliation may have been a motive for the murders. Thus, the challenged bank fraud and related death threats that Higgs issued when he became concerned that his partners in the fraud scheme might "snitch" on him were admissible to show Higgs's motive and intent to murder Jackson to likewise keep her from taking steps that might implement him in criminal activities or otherwise harm him in some way. *Cf. United States v. Van Metre*, 150 F.3d 339, 350-51 (4th Cir. 1998) (holding that evidence of a prior kidnapping and sexual assault committed by the defendant was admissible to establish his motive and intent to sexually assault the deceased victim in a kidnapping-resulting-in-death case); *Queen*, 132 F.3d at 993-94 (upholding admission of evidence, in a witness tampering case, that the defendant had intimidated two witnesses in an unrelated, earlier prosecution); *United States v. Clark*, 988 F.2d 1459, 1465 (6th Cir. 1993) (per curiam) (upholding admission of evidence of threats and plans to harm other witnesses to establish motive and intent to murder where the defendant was charged with the murder of a person he wanted to silence).

## C.   Sufficiency of the Evidence

Finally, Higgs contends that the evidence was insufficient to support each of his convictions. In determining the sufficiency of the evidence supporting a conviction, this court must determine whether "there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942); see *also United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

### 1.   Evidence of Kidnapping and Felony Murder

Higgs claims that the evidence was legally insufficient to convict him of kidnapping the victims under 18 U.S.C.A. § 1201 or of first-degree murder occurring during the perpetration of a kidnapping under 18 U.S.C.A. § 1111(a). In order to establish that Higgs kidnapped the victims, the government was required to prove that each

victim was "(1) unlawfully seized, confined, inveigled, decoyed, kid-napped, abducted or carried away by any means whatsoever; and (2) was held for ransom or reward or otherwise." *Chatwin v. United States*, 326 U.S. 455, 459 (1946) (internal quotation marks omitted); *United States v. Lewis*, 662 F.2d 1087, 1088 (4th Cir. 1981).

According to the testimony of Gloria, after the argument between Higgs and Jackson was broken up by Haynes, the women left the apartment on foot. After expressing anger about one of the women writing down his license plate number, Higgs retrieved the .38 caliber weapon before leaving the apartment, moments before instructing Haynes to get the women into the van. Shortly after Higgs drove past the most direct route back to the homes of the three young women, he stopped the van on the side of the road in a desolate stretch of the Patuxent National Wildlife Refuge. Aware at that point that something was amiss, one of the women asked if they were going to have to "walk from here" and Higgs responded "something like that." J.A. 482. Higgs then handed the gun to Haynes and Haynes got out of the van and shot the three women.

Higgs claims that this evidence is insufficient to show that he "unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted or carried away" the three women because they voluntarily got into Higgs's van based upon what Haynes told them and that it was also insufficient to establish that the women were "held for ransom or reward or otherwise." *Chatwin*, 326 U.S. at 459. We disagree. The evidence presented was more than sufficient to support the conclusion that the three women, who had left the apartment on foot during the early morning hours after the argument, were tricked or lured by Haynes, at Higgs's direction, into getting into the van with the promise of a ride home and, therefore, that Higgs and Haynes "inveigled" or "decoyed" them within the meaning of § 1201, and that Higgs at least was prepared to confine them at gunpoint if necessary. *See United States v. Boone*, 959 F.2d 1550, 1555 (11th Cir. 1992) (To determine whether there has been inveigling for purposes of a kidnapping conviction, the "fact finder must ascertain whether the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed."). The evidence was also sufficient to support the conclusion that Higgs and Haynes, after confining the women in the van under

the pretense of taking them home and then stopping on the side of the road against their wishes, held and ultimately killed the women to avenge Higgs's fight with Jackson, or perhaps to retaliate against Jackson for an earlier action or threat she had made, and to prevent Jackson and her friends from retaliating against Higgs. *See United States v. Healy*, 376 U.S. 75, 81 (1964) (holding a victim "for ransom, reward *or otherwise*" under § 1201 encompasses holding a victim for any reason which was of benefit to the defendant); *United States v. Childress*, 26 F.3d 498, 503 (4th Cir. 1994) (stating that kidnapping need not be performed for pecuniary gain; "ransom or otherwise" element is satisfied if "the defendant acted for *any* reason which would in *any* way be of benefit"). Accordingly, we conclude that the evidence was sufficient to convict Higgs of the kidnapping and felony murder counts.

### 2.    Evidence of First-Degree Premeditated Murder

Higgs also claims that the evidence was legally insufficient to convict him of first-degree premeditated murder under 18 U.S.C.A. § 1111(a), because there was no evidence that he knew Haynes was going to shoot the women, even though he provided Haynes with the murder weapon moments before the killings. We disagree.

In order to convict Higgs of first-degree premeditated murder, the government was required to prove that Higgs "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *United States v. Horton*, 921 F.2d 540, 543 (1990) (internal quotation marks omitted). The government clearly satisfied this standard. Contrary to Higgs's contention, his handing the murder weapon to Haynes was not the only evidence of his participation in the premeditated murder of the three women. The jury could easily have concluded that the murders were motivated by Higgs's fight with Jackson and her copying down Higgs's license plate number. Higgs retrieved the gun used to commit the murders from a drawer in his apartment in the first instance, and instructed Haynes to lure the women into the van. After engaging in a whispered conversation with Haynes, Higgs also drove the van to the location of the murders, passing the most direct route back to the victims' homes. After Higgs pulled the van over to the side of the road on an

isolated stretch of highway, Jackson asked him if they were being put out, and Higgs replied "something like that." J.A. 482. At that point, he supplied the gun used to commit the murders to Haynes, mere moments before Haynes shot and killed the women. Clearly, there was sufficient evidence for the jury to convict Higgs of the charged offenses.

### 3.   Evidence of Section 924(c) Violations

For the same reasons, we likewise reject Higgs's challenge to the sufficiency of the evidence proffered to convict him of the firearm violations. In order to establish a violation of 18 U.S.C.A. § 924(c), the government was required to prove that Higgs (1) "used or carried a firearm," and (2) that he "did so during and in relation to" the murders. *See United States v. Mitchell*, 104 F.3d 649, 652 (4th Cir. 1997). Higgs retrieved the gun from a drawer in his apartment before leaving the apartment to pursue the three women and kept the gun in his possession until after he had pulled off the road and instructed the women to get out of the van. Thus, it is clear that substantial evidence supports the jury's verdict on these counts as well.

### V.   Sentencing Phase Challenges

We now turn to Higgs's challenges to various rulings pertaining to the capital penalty phase of his trial.

### A.   Challenges to the Statutory Aggravating Factors

We begin with Higgs's independent challenges to the four statutory aggravating factors that were submitted to the jury for consideration during the capital penalty phase. Prior to the hearing, Higgs moved to strike each of the proposed statutory aggravating factors, and each motion was denied by the district court. We review the district court's legal conclusions *de novo*. *See United States v. Helem*, 186 F.3d 449, 454 (4th Cir. 1999).

### 1.   Death During the Commission of a Kidnapping

For the charges of first-degree premeditated murder and first-degree murder committed in the perpetration or attempted perpetra-

tion of a kidnapping, *see* 18 U.S.C.A. § 1111(a), the court submitted as a statutory aggravating factor the fact that "the death[s] . . . occurred during the commission or attempted commission of . . . an offense under . . . section 1201 (kidnapping)," 18 U.S.C.A. § 3592(c)(1).

Higgs argues that this aggravating factor merely repeated the substantive elements of the section 1201 kidnapping counts for which he was also found guilty during the guilt phase of the trial and, therefore, failed to narrow or channel the jury's discretion to impose the sentence of death. *See Zant*, 462 U.S. at 877 (holding that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"). In other words, Higgs asserts that the aggravating factor served no narrowing function because the government improperly used the fact that death occurred during the commission of a kidnapping as both an element of the substantive crimes for which he was charged and as an aggravating factor for his crimes.

This claim is without merit. "Death during commission of another crime" was not submitted as an aggravating factor for the substantive kidnapping counts charged under 18 U.S.C.A. § 1201. It was only submitted as an aggravating factor for the first-degree premeditated murder and first-degree murder committed in the perpetration of a kidnapping charged under 18 U.S.C.A. § 1111(a). As to the § 1111(a) murder counts for which it was submitted, the kidnapping factor clearly did serve the requisite narrowing function for the jury. In order to convict Higgs of the § 1111(a) first-degree murder committed in the perpetration of a kidnapping charge, the jury had to find that a kidnapping had occurred. However, the "narrowing function" mandated by the Eighth Amendment in death penalty cases "may . . . be performed by jury findings at either the sentencing phase of the trial or the guilt phase." *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988). And, the Eighth Amendment does not prohibit the use of an aggravating factor during the sentencing phase that duplicates one or more elements of the offense of the crime found at the guilt phase. *See id.* at 246; *see also United States v. Hall*, 152 F.3d 381, 416-17 (5th Cir. 1998) (upholding submission of the § 3592(c)(1) statutory aggravating factor in prosecution for kidnapping resulting in death);

*United States v. Jones*, 132 F.3d 232, 249 (5th Cir. 1998) (rejecting defendant's contention that a statutory aggravating factor providing that the defendant caused the death of the victim during the commission of a kidnapping failed to genuinely narrow the class of persons eligible for the death penalty); *Deputy v. Taylor*, 19 F.3d 1485, 1502 (3rd Cir. 1994) (noting that "federal courts of appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating circumstance even if it is duplicitous"). Accordingly, we find no error in the district court's submission of the statutory aggravating factor to the jury.

### 2.   Previous Conviction of a Violent Felony Involving a Firearm

Higgs next challenges the district court's submission as a statutory aggravating factor the fact that Higgs had been previously convicted of a violent felony involving a firearm. *See* 18 U.S.C.A. § 3592(c)(2). The aggravating factor was based upon Higgs's participation in the December 1995 Cherry Lane shooting. Higgs pleaded guilty in Maryland state court to assault and reckless endangerment for the offense in April 1997. During the plea colloquy, which was admitted into evidence in Higgs's sentencing proceeding, the prosecutor stated that Higgs had fired a .38 caliber handgun and Haynes had fired a 9 mm handgun during the incident. In response, Higgs claimed that he "didn't have a .38. It was the other way around." J.A. 1104.

On appeal, Higgs argues that the court must take a "categorical" approach to determining whether a prior felony conviction involved the use of a firearm, *i.e.*, the court may only look to the fact of conviction and the statutory definition of the crime of conviction to determine whether a firearm was involved, not to the particular facts of the case. *Cf. Taylor v. United States*, 495 U.S. 575, 588-89 (1990) (holding that courts must employ a categorical approach when determining whether burglary was a predicate crime of violence for armed career offender status under 18 U.S.C.A. § 924(e)); *United States v. Pierce*, 278 F.3d 282, 286 (4th Cir. 2002) (holding that, in determining whether a state felony offense of taking indecent liberties with a child falls within the federal definition of a "crime of violence" for purposes of U.S.S.G. § 4B1.1, the court must employ a similar "categorical approach, which takes into account only the definition of the

offense and the fact of conviction"). According to Higgs, because use of a firearm is not a specific element of the Maryland offenses of assault and reckless endangerment, the crimes to which he pled guilty, and he did not specifically admit the use of a firearm during the Cherry Lane incident, the prior conviction did not "involv[e] the use or attempted or threatened use of a firearm . . . against another person" as required by § 3592(c)(2).

We reject this claim as well. Higgs correctly points out that the Supreme Court has called for such a categorical approach when Congress has specified that a predicate offense have certain elements. *See, e.g.*, *Taylor*, 495 U.S. at 588; *Pierce*, 278 F.3d at 286; *United States v. Ward*, 171 F.3d 188, 192 (4th Cir. 1999). However, this same approach is not required under § 3592(c)(2) of the federal death penalty scheme. Section 3592(c)(2) provides, as a statutory aggravator, the fact that

> the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, *involving the use or attempted or threatened use of a firearm* (as defined in section 921) against another person.

18 U.S.C.A. § 3592(c)(2) (emphasis added). Because the language quite plainly requires only that the previous conviction "involv[e] the use or attempted or threatened use of a firearm," it authorizes and likely requires the court to look past the elements of the offense to the offense conduct. *See United States v. Chong*, 98 F. Supp. 2d 1110, 1120 (D. Haw. 1999). Additionally, whereas the court in *Taylor* noted that the categorical approach was proper to avoid "the practical difficulties and potential unfairness of a factual approach," *Taylor*, 495 U.S. at 601, the Court has made it clear that an individualized determination *is* required in the death penalty context, *Zant*, 462 U.S. at 877-79. Accordingly, we hold that the district court did not err in submitting the challenged statutory aggravating factor to the jury for its consideration.

**Volume 2 of 2**

### 3.   Previous Conviction of a Serious Federal Drug Offense

Higgs next claims that the district court erred in refusing to strike as an aggravating factor the fact that he "had previously been convicted" of a serious drug offense carrying a potential sentence of five years or more. *See* 18 U.S.C.A. § 3592(c)(12).

The federal drug offense at issue involved Higgs's conviction for possession with intent to distribute cocaine base, which arose from the drugs seized during the search of his apartment on March 21, 1996. Higgs pled guilty in May 1997 to the drug offense, and judgment was entered in December 1997. Higgs argues that, for purposes of the death penalty statute, a defendant has been "previously convicted" of a federal drug offense only if the predicate drug conviction occurred prior to the conduct giving rise to capital murder. Had Congress intended to include *any* conviction prior to the sentencing hearing, the argument goes, it would have framed the issue as whether the defendant "has been convicted" of a predicate offense, rather than "had previously been convicted" of a predicate offense. Because his drug arrest and conviction for a serious drug offense occurred after the murders, Higgs asserts that the statutory aggravator was improperly submitted for consideration by the jury. The district court disagreed, ruling that the aggravator refers to any conviction for a serious drug offense that occurred prior to sentencing and, therefore, denied the motion to strike the factor.

As support for their respective interpretations of the language of the statute, the parties direct us to analogous language and practice under the United States Sentencing Guidelines. The government, for example, points us to U.S.S.G. § 4A1.2 (2002), which provides that, for purposes of calculating a defendant's criminal history category under the United States Sentencing Guidelines, a "prior sentence" includes "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense." As correctly pointed out by the government, the commentary makes clear that "[a] sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense." U.S.S.G. § 4A1.2, cmt. n.1. For purposes of establishing whether a defendant is a career offender, however, the guidelines are equally clear that "prior convictions" only count if they occurred before commission of the federal crime. *See* U.S.S.G. § 4B1.2(c).

Higgs, for his part, points us to the case of *United States v. Barton*, 100 F.3d 43 (6th Cir. 1996), which interprets a more ambiguous provision of a now-defunct guideline, U.S.S.G. § 2K2.1, which provided

for an increase in the base offense level for a firearms offense if the defendant "had one prior felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2000). The *Barton* court held that the use of the words "had" and "prior" reflected an intent to only encompass predicate convictions occurring prior to the conduct which formed the basis for the federal offense. *See Barton*, 100 F.3d at 46. Those circuits that have addressed the issue of whether use of the past-tense verb "had" when referring to prior convictions under § 2K2.1 encompassed post-offense convictions, however, ultimately reached differing results. *Compare United States v. Oetken*, 241 F.3d 1057, 1058-60 (8th Cir. 2001) (reaching same conclusion as *Barton* court), *with United States v. Laihben*, 167 F.3d 1364, 1366 (11th Cir. 1999) (holding that post-offense convictions do count as prior felony convictions for purposes of § 2K2.1); *United States v. Pugh*, 158 F.3d 1308, 1309-1312 (D.C. Cir. 1998) (same); *United States v. Gooden*, 116 F.3d 721, 724-725 (5th Cir. 1997)(same); *United States v. McCary*, 14 F.3d 1502, 1505-06 (10th Cir. 1994)(same).

In 2001, the Sentencing Commission put an end to the difference of opinion, amending § 2K2.1 to provide that a defendant's base offense level would be increased where "the defendant committed any part of the instant offense *subsequent to* sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(2001) (emphasis added). Thus, the Sentencing Commission adopted the minority view, but it did not make that view retroactive. *See Cofske v. United States*, 290 F.3d 437, 442 (1st Cir. 2002) (adopting the "minority view" for purposes of sentencings which occurred prior to the amendment, but noting that "[o]ne could as easily call [the change] a revision as a clarification").

In the end, we find the parties' reliance upon the sentencing guidelines to be of limited utility. We hold that the § 3592(c)(12) statutory aggravating factor encompasses *all* predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges. In short, we can discern no basis upon which to conclude that Congress intended that the prior serious drug offense aggravator encompass only drug offenses or convictions that occurred prior to the conduct giving rise to the murder or kidnapping charges. Unlike others contained within § 3592(c), the aggravator does not

concern matters directly related to the death penalty offense. Rather, it is concerned with the characteristics of the offender as of the time that he is sentenced. Although it easily could have done so, Congress did not specify that either the prior offense or conviction had to occur before the death penalty offense. On the contrary, the entire section speaks in terms of those things that must be considered when the death sentencing hearing is conducted and the petit jury begins its weighing process. And, we note that where Congress has intended a different practice in other circumstances, it has made that intent clear. *See, e.g.*, 21 U.S.C.A. § 841(b)(1)(C) (West Supp. 2003) (providing for an enhanced penalty "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final"; 18 U.S.C.A. § 922(g)(1) (West 2000) (stating "[i]t shall be unlawful for any person . . . who has been convicted . . . to [commit specified violations]").

At bottom, Higgs's argument is that the prior drug conviction aggravator of § 3592(c)(12) is to be treated differently than every other prior conviction aggravator because it directs us to inquire as to whether the defendant "had previously been convicted," (*i.e.*, uses the past-perfect tense), rather than "has previously been convicted" (as does every other statutory, prior conviction aggravator contained within § 3592(c), as well as § 3592(b) and (d)).[8] This grammatical difference is far too tenuous a basis upon which to conclude that Congress intended that the prior serious drug offense aggravating factor for homicide was to be treated differently than every other prior conviction aggravating factor and every other prior serious drug offense aggravating factor for other crimes under the FDPA.[9]

---

[8]18 U.S.C.A. § 3592(b) and (d) address aggravating factors for espionage and treason and the aggravating factors for drug offense death penalties. They contain identical aggravators for a previous conviction of a serious drug offense, but use the term "has" instead of "had" when referring to them.

[9]Higgs contends that this reading of § 3592(c)(12) would be inconsistent with *Ring v. Arizona*, 536 U.S. 584 (2002), because statutory aggravators must be found by the grand jury and included within the indictment. Because we have concluded that prior convictions need not be alleged in the indictment, submitted to the jury, or proven beyond a reasonable doubt, *see Almendarez-Torres*, 523 U.S. at 226-27, we need not interpret § 3592(c)(12) as requiring prior convictions to be prior to the grand jury's indictment in order to pass constitutional muster.

Finally, even if the aggravator was improperly submitted for consideration, the error was harmless. The prior drug offense aggravator was only one of six aggravating factors submitted to and found by the jury, and the jury found only three mitigating factors (and only one of these unanimously — that Higgs was not the sole proximate cause of the deaths). Accordingly, Higgs would not be entitled to relief on this basis.

### 4. Multiple Killings

Finally, Higgs contests the district court's denial of his motion to strike multiple killings in a single criminal episode as a statutory aggravating factor, *see* 18 U.S.C.A. § 3592(c)(16), because reliance upon the aggravating factor violated his rights under the Ex Post Facto Clause. The district court denied the motion, ruling that the aggravating factor was not a substantive change because it did not increase the punishment that was available when the murder was committed.

As discussed earlier, we agree that the "multiple killings" aggravator was improperly submitted to the jury as a statutory aggravating factor. Reliance upon a statutory aggravating factor that was added to the death-penalty statute after a murder is committed would run afoul of the Ex Post Facto Clause *if* the aggravating factor served as the sole aggravating factor that rendered the crime death-eligible because it would clearly "increase the punishment for [the] criminal acts." *Morales*, 514 U.S. at 504; *see Carmell*, 529 U.S. at 521-525. It does not follow, however, that Higgs's death sentences are infirm.

In Higgs's case, the jury found the existence of four statutory aggravators for the first-degree murder convictions and three statutory aggravators for the kidnapping conviction. Accordingly, although the district court's submission of the "multiple killings" aggravating factor as a *statutory* aggravating factor was error, its submission as such was harmless error. *See Zant*, 462 U.S. at 884 ("[A] death sentence supported by at least one valid aggravating circumstance need not be set aside . . . simply because another aggravating circumstance is 'invalid' in the sense that it is insufficient by itself to support the death penalty."); *United States v. Paul*, 217 F.3d 989, 1001 (8th Cir. 2000) (consideration of inapplicable statutory aggravator was harm-

less error where jury found two other statutory aggravators existed). Because the jury found the existence of at least one intent factor and at least one other properly-submitted statutory aggravating factor, the murder was death-eligible. Any additional statutory and nonstatutory aggravating factors did not increase the *available* punishment and were, instead, appropriately considered by the jury in determining whether to impose the death sentence.

### B.    Constitutional Challenges to the Nonstatutory Aggravators

The government submitted two nonstatutory aggravating factors for the jury's consideration — victim impact and obstruction of justice — after having given appropriate notice to the defendant.[10] On appeal, Higgs asserts that the statute's authorization of the jury's consideration of nonstatutory aggravating factors is unconstitutional for four separate reasons. We also review these challenges de novo. *See Helem*, 186 F.3d at 454.

### 1.    The Consideration of Nonstatutory Aggravators by the Jury

First, Higgs argues that the FDPA violates the Eighth and Fourteenth Amendments to the Constitution because the submission of nonstatutory aggravating factors at the penalty phase allows for the random and unguided imposition of the death penalty by jurors. *See McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) (providing that the jury's decision to impose death must be guided by "carefully defined standards that must narrow a sentencer's discretion"). We disagree. Once a defendant has been rendered eligible for the death penalty by the jury's finding of a statutory aggravating factor, the use of nonstatutory aggravating factors serves only to individualize the sentencing determination.[11] *See Zant*, 462 U.S. at 878-79 (holding that the use of

---

[10]Prior to the start of the penalty phase, the government withdrew future dangerousness, for which notice had also been given, as an additional nonstatutory aggravating factor.

[11]A nonstatutory aggravating factor is improper if it is not "relevant to the character of the defendant or the circumstances of the crime." *Barclay v. Florida*, 463 U.S. 939, 967 (1983) (Stevens, J., concurring). Higgs does not claim that either of the nonstatutory aggravating circumstances submitted to the jury was invalid on this basis.

nonstatutory aggravating factors is appropriate after the jury finds the existence of at least one statutory aggravating factor that narrows the class of defendants eligible for the death penalty); *United States v. McCullah*, 76 F.3d 1087, 1106-07 (10th Cir. 1996) ("The Supreme Court has dealt with the issue of non-statutory aggravating factors in state capital punishment statutes and has held the use of non-statutory aggravating factors permissible."). Thus, we reject the contention that the FDPA is unconstitutional merely because it allows the sentencing jury to weigh nonstatutory aggravating factors when deciding whether to impose the sentence of death upon a defendant convicted of a death-eligible offense.

## 2.   Proportionality Review by the Court

Higgs next claims that the FDPA is facially unconstitutional because it does not require proportionality review of a death sentence. Although acknowledging that the Supreme Court has held that the Eighth Amendment does *not* require state courts to conduct such a review, *see Pulley v. Harris*, 465 U.S. 37, 43 (1984), Higgs asserts such review *is* required when a death penalty scheme allows a jury to weigh nonstatutory aggravating factors in deciding whether to impose a death sentence.

Higgs bases this argument on two cases in which the Supreme Court observed that proportionality review is a useful safeguard against arbitrary imposition of the death penalty. *See Zant*, 462 U.S. at 890; *Gregg v. Georgia*, 428 U.S. 153, 198 (1976). Neither case, however, holds that proportionality review is mandated, and both pre-date the Court's decision in *Pulley*. As noted by the Court in *Pulley*, "that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. . . . Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement." *Pulley*, 465 U.S. at 44-45. Nor are we persuaded by Higgs's attempt to distinguish *Pulley* because it did not deal with a death penalty scheme involving nonstatutory aggravating factors. *See Jones*, 132 F.3d at 240-41 (rejecting attempt to distinguish *Pulley* from application to the FDPA on this basis, and holding that "the Constitution does not mandate proportionality review when the capital sentencing scheme permits the jury to consider nonstatutory aggravating factors as long as the

statute provides for other safeguards against an arbitrary imposition of the death penalty"); *see also United States v. Allen*, 247 F.3d 741, 760 (8th Cir. 2001) (holding "that the FDPA has sufficient safeguards —notably the requirements that a jury find beyond a reasonable doubt the existence of one statutory aggravating factor and at least one of four requisite levels of specific intent on the part of a defendant, not to mention various other procedural protections—such that proportionality review is not required in order for the FDPA to pass constitutional muster"), *vacated on other grounds*, 536 U.S. 953 (2002). Accordingly, we reject Higgs's claim that the FDPA violates the Eighth Amendment because it does not require proportionality review.

### 3.   Improper Delegation by Congress

Higgs next contends that, by affording prosecutors virtually unlimited discretion in identifying and defining nonstatutory aggravating factors, the FDPA impermissibly delegates legislative power to government prosecutors in violation of the separation-of-powers doctrine.

We likewise reject this argument. First, the statute does not delegate a legislative function to the prosecutor. The prosecutor's discretion with regard to defining what is a death-eligible offense is wholly circumscribed by the statute's requirement that the jury unanimously find at least one intent factor and one statutory aggravating factor before the defendant becomes death eligible. *Cf. Jones*, 527 U.S. at 376-77 (noting that, "[e]ven on a finding of intent, . . . a defendant is not death eligible unless the sentencing jury also finds that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors set forth at § 3592"). Only after the selection of those critical, legislatively-defined factors is made is the prosecutor afforded discretion to argue that additional nonstatutory aggravators combine with the statutory aggravators to outweigh any mitigating factors that have been submitted for consideration, thus assisting the jury in its task of determining whether a death-eligible defendant should indeed receive that maximum sentence. *See, e.g., id.* at 377-78; *Jones*, 132 F.3d at 240.

Moreover, to the extent that this discretion could be viewed as a delegation of legislative power, such delegation is constitutionally

permissible. *See Tipton*, 90 F.3d at 895 (rejecting facial challenge to the death sentencing provisions of 21 U.S.C.A. § 848, which also permits the consideration of nonstatutory aggravating factors, because "any delegation involved was sufficiently circumscribed by 'intelligible principles' to avoid violating separation of powers principles"); *Paul*, 217 F.3d at 1003 ("[T]he prosecutor's authority to define nonstatutory aggravating factors is a constitutional delegation of Congress' legislative power."); *Jones*, 132 F.3d at 239-40 (same); *McCullah*, 76 F.3d at 1106 (holding that "[t]he prosecutorial discretion to promulgate non-statutory aggravating factors falls squarely within the permissible delegation of power to the Executive Branch").

### 4. Violation of the Ex Post Facto Clause

Higgs's final constitutional challenge to the FDPA's authorization of the use of nonstatutory aggravating factors centers on his claim that the statute violates the Ex Post Facto Clause because it allows the prosecution to define aggravating factors after the crime was committed. The district court rejected this argument based on *Walton v. Arizona*, 497 U.S. 639 (1990).

Although Higgs correctly points out that *Walton* was overruled by *Ring*, he is not entitled to relief. Although aggravating factors do "make[ ] more burdensome the punishment for [the] crime," *Dobbert*, 432 U.S. at 292, nonstatutory aggravating factors and mitigating factors are weighed by the jury to make the individualized determination to impose the death sentence upon a defendant who has already been found eligible. They do not increase the possible punishment or alter the elements of the offense.

### C. Evidentiary Challenges to the Obstruction Aggravator

Higgs also raises challenges to the evidence admitted by the district court in support of the nonstatutory aggravating factor of obstruction of justice. The government argued that Higgs obstructed the investigation into and prosecution of the murders based upon evidence that Higgs, along with Haynes and Gloria, got rid of the .38 caliber murder weapon and disposed of any physical evidence that the three women had been in Higgs's apartment that evening; that Higgs solicited false statements and testimony from Phyllis Smith, Smith's fam-

ily members, and Darby concerning his whereabouts on the night of the murder in order to establish an alibi; that Higgs, while incarcerated, made plans with at least one accomplice to eliminate Gloria as a witness; and that Higgs attempted to intimidate an eyewitness to the Chaconia shooting to help defeat the D.C. charges against him. We review the district court's rulings for an abuse of discretion. *See United States v. Lancaster*, 96 F.3d 734, 744 (4th Cir. 1996) (en banc).

### 1.   Admission of Evidence of Unadjudicated Crimes

We begin with Higgs's contention that it was improper to allow the government to introduce evidence that Higgs engaged in obstruction of justice by getting rid of the murder weapon, destroying the physical evidence of the victims' presence in his apartment, directing Smith and her family to lie to the police and the grand jury regarding his whereabouts on the night of the murder, and planning the elimination of Gloria as an eyewitness against him. Because prior convictions are specifically included as statutory aggravating factors, *see* 18 U.S.C.A. § 3592(c), Higgs asserts that only conduct that results in a conviction for listed crimes may constitute an aggravating factor. Accordingly, the argument goes, the district court erred in admitting evidence of an uncharged and unadjudicated offense of obstruction of justice.

This argument is plainly without merit. Although the FDPA does specify certain types of convicted criminal conduct that may be used as a statutory aggravating factor authorizing imposition of the death penalty, it also provides that "[t]he jury . . . may consider whether any other aggravating factor for which notice has been given exists" when making the individualized decision of whether the authorized sentence of death should indeed be imposed. 18 U.S.C.A. § 3592(c). There is no question that the government gave Higgs appropriate notice that it would pursue obstruction of justice as an additional, nonstatutory aggravator, and we have no doubt that Higgs's destruction of evidence and tampering with witnesses in order to cover his tracks, impede the investigation into the murders, and increase his chances of being acquitted were highly relevant aggravating circumstances which were properly submitted to the jury for its consideration in making the requisite individualized determination. For the same reasons, we also reject Higgs's contention that its probative

value was outweighed by the dangers of unfair prejudice and confusion.

We may summarily reject Higgs's assertion that introduction of the evidence was prohibited by the Fifth, Sixth, and Eighth Amendments to the Constitution because the evidence lacked the requisite indicia of reliability necessary to impose a sentence of death and because the jury would be unable to fairly evaluate that evidence. The jury was carefully instructed that the government was required to "prove beyond a reasonable doubt that the defendant tampered and attempted to tamper with evidence and witnesses for the purpose of obstructing the investigation of the kidnappings and murders" of the three women. J.A. 1932. Accordingly, we find no error or abuse of discretion in the district court's submission of this evidence to the jury for its consideration as a nonstatutory aggravating factor.

### 2. Admission of Evidence Referring to Haynes's Confession

Higgs next challenges the district court's decision to allow Captain Robert Rule of the United States Park Police to introduce statements made by Haynes in his confession, which corroborated the testimony of Gloria and others, regarding the actions they took to eliminate physical evidence immediately after the murders. During the guilt phase, Gloria testified that either Higgs or Haynes disposed of the murder weapon in the Anacostia River immediately after the murders and that the three men then returned to the apartment to clean it and dispose of any items the women might have touched. Corroborating testimony was also introduced that the rented videotapes were never returned to the video store and that no victim fingerprints were found in the apartment. According to Captain Rule, Haynes's statements corroborated Gloria's testimony that Higgs drove from the murder scene to the Anacostia River, where Haynes threw the gun into the water, and that the three men then returned to Higgs's apartment where they cleaned it of potentially incriminating evidence.

Higgs objected to Captain Rule's testimony regarding Haynes's statements, asserting that the testimony was more prejudicial than probative. The district court rejected this assertion and admitted the testimony because, even if the rules of evidence applied, the statement

was a declaration against interest. *See* 18 U.S.C.A. § 3593(c) ("Information is admissible regardless of its admissibility under the rules of evidence governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.").

On appeal, Higgs now argues that the admission of Haynes's statements through Captain Rule violated the Confrontation Clause of the Sixth Amendment, which he contends does remain applicable during the penalty phase of the proceedings. Because this constitutional claim was not raised below, we review it only for plain error. *See Olano*, 507 U.S. at 732. In order to prevail under this standard, Higgs must establish that an error occurred, that it was plain, and that it affected his substantial rights. *Id.* Further, even if Higgs can make such a showing, we would exercise our discretion to correct such error only if it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. Assuming arguendo that the admission of Haynes's statements would be a violation of Higgs's rights under the Confrontation Clause during the guilt phase, *see Lilly v. Virginia*, 527 U.S. 116, 139 (1999) (plurality) (holding that a defendant's Sixth Amendment right to confront the witnesses against him was violated when an out-of-court statement made by his non-testifying co-defendant, which incriminated the defendant, was admitted into evidence at their joint trial), such presumed error was not plain in the context of Higgs's sentencing phase. It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding. *Cf. United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990) ("United States courts have a long history of using reliable hearsay for sentencing" and a "trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain") (internal quotation marks omitted). In *Bassette v. Thompson*, we rejected an argument that the admission of a psychiatrist's report during a capital sentencing proceeding violated the defendant's confrontation rights, relying in part on the Supreme Court's prior holding that the rules of evidence do not apply in such proceedings.

*See* 915 F.2d 932, 939 (4th Cir. 1990) (citing *Williams v. New York*, 337 U.S. 241, 251 (1949)); *but see Proffitt v. Wainwright*, 685 F.2d 1227, 1254 (11th Cir. 1982) (reaching contrary conclusion). And, in *Maynard v. Dixon*, 943 F.2d 407, 414 n.5 (4th Cir. 1991), we noted that the question of whether the Confrontation Clause applies in sentencing proceedings remains undecided.

Thus, even if the introduction of Haynes's statements through Captain Rule during the sentencing proceeding was error, we cannot say that the error was plain since it even now remains unclear whether the Confrontation Clause applies in this circumstance. *See Promise*, 255 F.3d at 160 (An error is plain "when the settled law of the Supreme Court or this circuit establishes that an error has occurred."). In addition, even if we were to assume error that was plain, we would not grant relief. Haynes's statements were merely corroborative of Gloria's eyewitness testimony regarding Haynes's and Higgs's acts of disposing of the gun and any physical evidence in the apartment, as well as the corroborative testimony that no fingerprints were found and that the videotapes were indeed never returned. Given the cumulative nature of the precise evidence challenged, and the overwhelming evidence otherwise proffered in support of the obstruction aggravator, we cannot say that Rule's limited testimony regarding Haynes's statements affected Higgs's substantial rights, nor would we exercise our discretion to correct the error as it did not seriously affect the fairness, integrity or public reputation of the judicial proceedings.

### 3.   Admission of Evidence Pertaining To The Chaconia Shooting

Higgs also challenges the admission of evidence that he attempted to obstruct the prosecution of charges filed against him related to the Chaconia Nightclub shooting, in order to minimize the damaging effect of that looming conviction in his murder case.

Higgs was charged with the Chaconia shooting in the D.C. Superior Court and housed at the D.C. jail. Higgs's counsel for the Chaconia charges believed that Richard Diolamou, who was at the Chaconia Nightclub on the night of the shooting and incarcerated elsewhere on unrelated charges, could offer testimony that would be helpful to Higgs's case. Thus, Diolamou was transferred to the D.C.

jail in April 1999, pursuant to a writ issued on Higgs's behalf, and was questioned by Higgs's counsel on three occasions. On the first two occasions, Diolamou failed to offer any helpful information. On the third occasion, Higgs personally attended the meeting with his attorney, but Diolamou again failed to offer any helpful information. Later, Higgs and another inmate, known by the name "Doc" to Diolamou, entered the room where Diolamou was watching television. After Higgs and Doc conversed privately for a short time, Doc left the room and returned with a screwdriver or shank. According to Diolamou, Higgs had "a smirk on his face." J.A. 1555. Diolamou became concerned about his safety and asked to be moved away from Higgs. He was not moved from Higgs's unit, but after the Chaconia case was dismissed in May 1999, Higgs wrote Diolamou a note stating that there were "no hard feelings" between them and wishing him luck on the street. J.A. 1537. The government argued that Higgs's intimidation of Diolamou was designed to obtain either a dismissal or acquittal on the Chaconia charges so that it would not harm his case on the murder charges.

Higgs first complains that the district court abused its discretion in admitting Diolamou's testimony because he did not receive pretrial notice that the government intended to introduce evidence concerning Diolamou or the Chaconia shooting in support of the obstruction of justice nonstatutory aggravator. This argument is plainly without merit. The FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor, which Higgs admittedly received in this case, not notice of the specific evidence that will be used to support it. *See* 18 U.S.C.A. § 3593(a) (requiring only that the government's notice "set[ ] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death"); *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999) (observing that notice given to a defendant of the applicable aggravating factors in a death penalty case is not the same as notice of the specific evidence that the government intends to present at a sentencing hearing), *cert. denied*, 529 U.S. 1022 (2000); *cf. Gray v. Netherland*, 518 U.S. 152, 167-68 (1996) (noting that there is no constitutional right to advance notice of the government's evidence in aggravation at a capital sentencing hearing).

Higgs also challenges the district court's conclusion that the evidence was relevant to the obstruction aggravator because it reflected Higgs's attempts "to dissociate himself from the bullet in the Chaconia shooting that is tied to the deaths." J.A. 1394. Higgs asserts that no such relevance exists because the bullet recovered from the Chaconia shooting was not the same *type* of bullets used to murder the three women, *i.e.*, it was not a wadcutter bullet. While true, this distinction does not render the evidence irrelevant. The bullet used in the .38 caliber revolver during the Chaconia shooting was only of a different *type* than those used in the murders. Indeed, while forensic evidence could not establish an exact match, the bullets examined from the murders, the Chaconia shooting, *and* the Cherry Lane shooting all had the same land and groove impressions, consistent with being fired from the same .38 caliber weapon. Accordingly, we hold that the district court did not abuse its discretion in admitting the evidence.

### D.   Challenges to the Mitigation Case

#### 1.   Challenges to Rulings Regarding Higgs's Culpability

As a mitigating factor in his case, Higgs argued that Haynes was equally culpable in the crimes, but had not been sentenced to death. *See* 18 U.S.C.A. §3592(a)(4). On appeal, Higgs contends that the district court violated his rights to due process and a fair trial by (1) denying his motion to preclude the government from offering the contrary argument that Higgs was more culpable than Haynes, the admitted triggerman, and (2) denying his motion to introduce arguments made by the government during Haynes's trial about the relative culpability of the two men, which Higgs believed to be irreconcilable with the government's current position. We review the district court's rulings for an abuse of discretion. *See United States v. Barnette*, 211 F.3d 803, 816 (4th Cir. 2000).

In some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. For example, due process may be violated if "an inconsistency . . . exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime," *see Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000) (finding due process violation where prosecution obtained two convictions for the same murder

based on conflicting statements from the same cooperating codefendant) (emphasis added), or where the evidence used at the two trials is "factually inconsistent and irreconcilable," *Paul*, 217 F.3d at 998 (holding that government's argument that both defendants were the triggerman and killed the victim was not inconsistent). *See also United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991) (holding that the defendant could inform the jury that the government had pursued a different theory during a previous trial).

No such inconsistency exists in this case. The "inconsistent" arguments relied upon by Higgs stem from arguments the government made in response to Haynes's tactic of conceding that he was the triggerman, but arguing that he committed the murders under duress from Higgs. Specifically, the government argued that, even though Higgs may have told Haynes to shoot the women, Haynes acted of his own free will and made the voluntary choice to commit three brutal acts of violence. Higgs asserts that the government's argument that Higgs was the mastermind and driving force behind the murders, and, therefore more culpable than Haynes because he ordered Haynes to kill the women, was inconsistent with the argument it advanced in Haynes's trial.

We disagree. The government argued precisely the same factual predicate for Haynes's and Higgs's convictions, *i.e.*, that Higgs retrieved the gun from his apartment, drove the van to the murder scene, and handed the gun to Haynes after the women got out of the vehicle. And, the government has consistently represented that Haynes was the sole triggerman in the murders. The government did not argue at Haynes's trial that Haynes was more culpable than Higgs, but rather that Haynes deserved the death penalty because he was no less than an equal partner in crime with Higgs. Nor did the government take any other position in the prior trial that would preclude it from arguing that Higgs was actually more culpable than Haynes. In short, the argument that Haynes was a "partner in crime" with Higgs because he could have chosen not to murder the women is not inconsistent with the argument that Higgs was more culpable because he brought the murder weapon to the scene and told Haynes to do it. It was certainly not so inconsistent as to amount to a due process violation.

## 2.  The Jury's Failure to Find Equal Culpability

In a similar vein, Higgs argues that his death sentence must be vacated and the case remanded because the jurors failed to find as a mitigating factor that Haynes was equally culpable in the crime, but did not receive a death sentence. Higgs contends that the mitigating factor was established by uncontradicted evidence and, therefore, that the jury's failure to find the factor reflects an arbitrary and unreliable decision requiring us to vacate the sentence. *See* 18 U.S.C.A. § 3595(c)(2)(A) ("Whenever the court of appeals finds that . . . the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor[,] . . . the court shall remand the case for consideration under section 3593 or imposition of a sentence other than death.").

Under 18 U.S.C.A. § 3592(a)(4), the jury is to consider, as a mitigating factor, whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C.A. § 3592(a)(4). At Higgs's request, the district court submitted the factor to the jury. However, although the jury unanimously found that Higgs was not the sole proximate cause of the victims' deaths, it unanimously refused to find that Haynes was equally culpable in the commission of the three capital murders.

Higgs argues that his death sentence must be reversed because the mitigating factor was supported by uncontradicted evidence that Haynes had been convicted on identical charges and sentenced to life. This argument fails, however, because the Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating. *See generally Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality). There is no constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence. *See Paul*, 217 F.3d at 999-1000. In addition, the jury's failure to find that Haynes's life sentence was a mitigating factor for Higgs was supported by the evidence. Although it was undisputed that Haynes was the triggerman, a rational juror could well have found that Higgs had the dominant role in the murders and, therefore, that Higgs and Haynes were not "equally culpable in the crime." 18 U.S.C.A. § 3592(a)(4). Equal culpability was simply not established by uncontradicted evidence.

### 3.   Evidence of Higgs's Death-Eligibility under Maryland Law

We review de novo Higgs's claim that the district court violated the Eighth Amendment by refusing to submit to the jury, as a mitigating circumstance, that Higgs would not have been eligible for the death penalty if the murders had occurred within the jurisdiction of the State of Maryland. Higgs sought to introduce expert testimony that, under Maryland law, the death penalty may only be imposed on the "triggerman" in cases such as this and to argue that, because the murders took place in an area where Maryland had an easement over federal property, he could not have known that he was on federal land when he committed the murders.

We find no error in the district court's refusal to submit the proposed mitigating factor to the jury. Section 3592(a) provides that "[i]n determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor." 18 U.S.C.A. § 3592(a). In addition to seven enumerated factors, the statute requires consideration of "[o]ther factors in the defendant's background, record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence." *Id.* Higgs asserts that his unknowing presence within federal jurisdiction, as opposed to the jurisdiction of the State of Maryland where he would have been ineligible for a death sentence, is a "circumstance[ ] of the offense that mitigate[s] against imposition of the death sentence." *Id.* We disagree.

The Constitution requires that the jury "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. However, evidence not falling within these categories may be excluded as irrelevant. *See Lockett*, 438 U.S. at 604 n.12.

We are satisfied that the district court properly rejected Higgs's request. An assertion that the death penalty is improper in one jurisdiction because it is not allowed in another is, at bottom, a reflection of the debate surrounding the propriety of the death penalty, which is a matter of policy for the legislative branch. *Cf. United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2000) (affirming the district court's

refusal to allow the defendant to argue that life imprisonment was sufficient punishment because such an argument was better addressed to the legislature). As such, it was not error to refuse to submit it as a mitigating factor in this case.

### E.  Challenge to the Government's Rebuttal Evidence

Higgs also contends that the district court erred in allowing the government to introduce as rebuttal evidence numerous prison infractions committed by Higgs while he was incarcerated.

In support of his mitigation case, Higgs presented testimony of a mitigation expert and family members regarding his family history and educational background. This evidence revealed that Higgs was born to a single mother and that his father was uninvolved in his childhood. When Higgs was ten years old, his mother died of breast cancer. Higgs went to live with his aunt and uncle, Constance and Hugh McKinnon, and was cared for by his extended family. When Higgs was eleven years old, another uncle was killed in a mugging and his grandmother died. His grandfather died a few years later. With regard to his educational background, Higgs repeated the second grade because of reading difficulties. However, he was an average student in high school, played high school sports, and graduated at the age of nineteen.

Mrs. McKinnon, Higgs's aunt, testified that Higgs assisted his mother during the last days of her battle with cancer, but that money he received from a medical malpractice suit after his mother's death, in her opinion, had a negative effect upon Higgs's work ethic. However, Mrs. McKinnon offered positive testimony concerning Higgs's relationship with his four-year-old son Daquon and testified that she believed the contacts between Daquon and Higgs were important for Daquon. Higgs's cousins, Gerard McKinnon and Alexa Cave, both testified that they viewed Higgs as their brother and were supportive of him. Cave testified that Higgs also had a positive relationship with her son, whom she refers to as Higgs's nephew, which had continued during his incarceration. In support of her testimony, three letters that Higgs had written to Cave while he was incarcerated were introduced into evidence. In the letters, Higgs wrote that he was "try[ing] to stay out of trouble" and that he was trying to be the best "father, uncle and

brother" that he could be. J.A. 1802. In short, Higgs sought to establish, as potentially mitigating factors, the fact that a sentence of death would have an adverse impact on Higgs's son and Cave's son, that he was trying to be a good prisoner, and that other factors in Higgs's background, record, character, or other circumstances of the offense mitigated against imposition of the death sentence.

In rebuttal, the government elicited testimony about a sealed juvenile adjudication for an armed robbery committed by Higgs when he was a senior in high school, as well as information that Higgs had been arrested in 1996 for possession of a gun on college grounds. The government also presented evidence of multiple prison infractions that Higgs had committed while incarcerated. Among other incidents, the government introduced evidence that Higgs had failed to cooperate with an institutional count; had demonstrated disorderly, disruptive, and disrespectful behavior on a number of occasions; had been caught in possession of a weapon; had engaged in a theft and fighting incidents; had thrown a cup of urine on another inmate; and had refused to provide information or cooperate in the investigation of a stabbing of Higgs by another inmate. Higgs objected to the introduction of his prison infractions, contending that the evidence lacked any nexus with Higgs's mitigation case and amounted instead to the improper admission of evidence of his future dangerousness, a nonstatutory aggravator that the government had withdrawn prior to starting the penalty phase. The district court admitted the evidence, over Higgs's objection, ruling that it was proper and fair "evidence to rebut the picture that the defendant has drawn with regard to who he is now and his future relationship with his son." J.A. 1803.

"[W]hen otherwise inadmissible, rebuttal evidence must be reasonably tailored to the evidence it seeks to refute." *Stitt*, 250 F.3d at 897 (footnote omitted). Rebuttal evidence is "[e]vidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party" or "which tends to explain or contradict or disprove evidence offered by the adverse party." *Id.* (alterations in original). "Rulings related to admission and exclusion of evidence are addressed to the sound discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Id.* at 896.

Here, we find no error in the district court's decision to allow evidence of Higgs's prison infractions as rebuttal to his mitigation case.

Higgs's mitigation evidence was directed in part to establish that he was attempting to stay out of trouble while incarcerated and that he was and intended to continue to be a good influence on his son and his nephew from prison. By presenting such evidence, Higgs opened the door to the subject of his "staying out of trouble" in prison and the evidence of Higgs's numerous infractions of prison rules at various facilities was reasonably tailored to refute the image Higgs attempted to create in mitigation. In addition, the district court gave the jury a limiting instruction prior to admission of the evidence, informing them that the rebuttal evidence could "only be considered by [them] insofar as it may rebut the mitigating factors that ha[d] been specified by the defendant" and was "not to be considered by [the jury] for any other purpose." J.A. 1835. Accordingly, we hold that the district court did not abuse its discretion in admitting the rebuttal evidence.

### F. The Penalty Phase Summation

Higgs next contends that the government engaged in improper argument during its penalty phase summation and rebuttal that deprived Higgs of a fair sentencing hearing. Specifically, Higgs claims that the prosecutor (1) improperly argued that the jurors were required by the law and their oath to impose a sentence of death, (2) improperly argued that Higgs was more culpable than Haynes for what occurred that night and that the jury should disregard the "equally culpable" mitigating factor argued by the defense, (3) improperly argued that the jury could not consider mercy in rendering its decision, (4) improperly interjected her personal opinion of Higgs and the verdict in her argument, and (5) improperly argued that Higgs would lead a soft life in prison if not executed.

"Improper remarks during closing argument do not always mandate retrial. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (internal quotation marks omitted). In order to obtain a new trial on the basis of prosecutorial misconduct, Higgs must demonstrate (1) that the government's remarks were in fact improper and (2) that the remarks "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *Id.* (internal quota-

tion marks omitted). In evaluating prejudice, a number of factors should be considered:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Id.* at 241 (internal quotation marks omitted). Ultimately, "[t]he issue of whether improper argument by government counsel has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *Id.* (internal quotation marks and alterations omitted).

### 1.   The Jurors' Duty to Impose Death

Higgs's first claim of prosecutorial misconduct, that the government improperly argued that the jurors were required by their oath and law to impose the death penalty, is without merit. In support of this claim, Higgs points to a number of statements in which the government reminds the jury of its oath to impose the death sentence if justified by the facts and the court's instructions and to the government's argument that the death penalty is the only just resolution of the case. The government's arguments strongly urged imposition of the death penalty given the egregious nature of the murders. However, they did not contradict the instructions given by the trial court regarding aggravating and mitigating circumstances or exceed the bounds of proper argument concerning the propriety of imposing the sentence under those instructions. Nor, in any event, would we conclude that the comments "so prejudiced the trial process as to require reversal." *Id.* (internal quotation marks omitted). The complained-of comments were isolated, did not rise to the level of argument that might mislead or inflame the jury concerning its duty or divert it from its task, and were made in the context of a case involving compelling evidence of numerous aggravating factors.

## 2.   The "Equal Culpability" Factor

We also reject Higgs's contention that the prosecution improperly argued that Higgs was more culpable than Haynes for what occurred that night and that the jury should disregard the "equally culpable" mitigating factor argued by the defense. The first claim essentially repeats Higgs's argument that the government impermissibly presented contradictory theories of the case in the trials of Haynes and Higgs and, for the reasons previously set forth in the discussion of that issue, is also without merit. The related second claim likewise fails. The government did not tell the jury that it should disregard the proffered mitigating factor, *i.e.*, that Haynes was an "equally culpable" defendant who received a life sentence. Rather, the government argued that the jury was not required to reach the conclusion that Haynes was equally culpable or otherwise reach the same sentencing result in Higgs's case as the jury did in Haynes's case. There was nothing improper about this argument.

## 3.   The Consideration of Mercy

Higgs next contends that the government impermissibly made the following argument during summation:

> [M]ercy is not what this case is about. Mercy is not in the instructions. It is not something you do in this case. Put aside all of those things.

J.A. 2037. Higgs contends that this statement was improper because it misrepresented and misstated the law concerning capital sentencing. The district court instructed the jury that, regardless of the findings on aggravating and mitigating circumstances, the death penalty was not required to be imposed. In a nutshell, Higgs argues that mercy is always an implicit sentencing consideration, and that the government improperly argued that the jury should set aside such a consideration. *See* 18 U.S.C.A. § 3592(a)(8); *Nelson v. Nagle*, 995 F.2d 1549, 1555-57 (11th Cir. 1993).

Higgs correctly argues that the jury is empowered to show mercy to reject a death sentence. Here, the prosecutor appropriately argued

that "mercy is not what this case is about" and that the jury should "[p]ut aside all of those things." J.A. 2037. However, the prosecutor's statements that "mercy is not in the instructions," and "not something you do in this case" (as opposed to not something it *should* do) arguably crossed into an argument in contradiction of the district court's instructions. However, we need not definitively determine whether the prosecutor's remarks were improper. Even if Higgs could demonstrate that the comments amounted to error, they did not prejudicially affect Higgs's substantial rights so as to deprive him of a fair trial. The challenged remarks amounted to isolated statements in a lengthy closing argument. There is no indication that the comments were made to confuse or mislead the jury, and the district court explicitly instructed the jury that it need not impose the death sentence regardless of the findings on mitigation and aggravation. *See* J.A. 1996 ("Even if you find that all of the aggravating factors are established beyond a reasonable doubt and that none of you ha[ve] [found] that any mitigation has been established at all, you still have the right to decide against the death penalty in the case. . . .").

### 4.    The Expression of Personal Opinion

Higgs next argues that the prosecutor improperly injected her personal opinion about Higgs by repeatedly using the personal pronoun "I." In particular, Higgs objects to the following statement from the conclusion of the prosecutor's argument:

> I keep coming back to these beautiful young women and I look at them and I can't believe . . . Mr. Higgs has caused this hell for so many people, that he has ruined so many lives with his actions and the way he has chosen to live his life. I have to think, ladies and gentlemen, this world would have been a better place without Dustin Higgs. The hard truth is, ladies and gentlemen, it would be a better world in the future without Dustin Higgs.

J.A. 1982.

As a general premise, a prosecutor's repeated references to his or her personal opinion about a defendant may indeed be found improper. *See Boyd v. French*, 147 F.3d 319, 328-329 (4th Cir. 1998).

However, a prosecutor's "use [of] the phrase 'I think' in an innocuous, conversational sense" does not violate due process because such use "do[es] not suggest an attempt to replace the evidence with the prosecutor's personal judgments." *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995). Prosecutors must remain mindful to avoid the expression of personal opinions. However, in this case, the prosecutor's statements did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Mitchell*, 1 F.3d at 240.

### 5.  Higgs's Life in Prison

We summarily reject Higgs's final claim that the government improperly argued that life imprisonment would be soft because Higgs could go to school, have a job, establish friendships, talk on the phone to his friends and family, eat food, watch television, read the newspaper, and generally establish a life within the prison community. We find no impropriety in the government's argument, much of which followed similar, but opposing, notions argued by Higgs that life in prison meant life in a high security place of confinement where Higgs would be continuously monitored. In any event, we would not grant him relief. The remarks did not so prejudicially affect Higgs's substantial rights so as to deprive him of a fair sentencing hearing.

### G.  Passion and Prejudice

The FDPA requires us to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," 18 U.S.C.A. § 3595(c)(1), in violation of the Fifth, Sixth, and Eighth Amendments. In undertaking this duty, "we look to the record to see if these factors motivated the jury's recommendation of the death penalty, including an analysis of the aggravating factors to see if the jury had an abundance of evidence to support imposition of the death penalty." *Barnette*, 211 F.3d at 821. Higgs argues that the emotional content of this case was so extreme as to render his death sentences invalid under this provision. We disagree. We find no basis upon which to conclude that the jury imposed the death penalty under improper influence. "[W]hile [death penalty] proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case will not be emotionless." *Id.* Here, we find no indication that

the jury was swayed by emotion rather than reason in deciding to impose the sentences of death upon Higgs.

### H.   Cruel and Unusual Punishment

Higgs preserves for appellate review his argument that the death penalty is cruel and unusual punishment under all circumstances and, therefore, violates the Eight Amendment. As acknowledged by Higgs, this argument is foreclosed by Supreme Court precedent. *See McCleskey*, 481 U.S. at 300-03; *Gregg*, 428 U.S. at 187; *Jones*, 132 F.3d at 242.

### VI.   Firearm Sentences

Finally, we review de novo Higgs's challenge to the term of imprisonment imposed for the three § 924(c) firearm convictions. The district court imposed consecutive sentences of five years imprisonment, twenty years imprisonment, and twenty years imprisonment on Count Five (use of a firearm during and in relation to the murder and kidnapping of Black), Count Ten (use of a firearm during and in relation to the murder and kidnapping of Chinn), and Count Fifteen (use of a firearm during and in relation to the murder and kidnapping of Jackson), respectively. The twenty-year sentences were imposed pursuant to § 924(c)'s requirement of such enhanced penalties for all "second or subsequent" convictions. *See* 18 U.S.C.A. § 924(c)(1). On appeal, Higgs challenges the enhanced twenty-year sentences, arguing that they were not "second or subsequent" within the meaning of the statute because all three counts arose from one criminal episode in which a single gunman fired multiple shots.

In *Deal v. United States*, 508 U.S. 129 (1993), the defendant committed six armed bank robberies over the course of four months. He was charged in a single indictment with six § 924(c)(1) violations, each of which corresponded to one of the bank robberies also charged. After Deal was convicted on all counts, the district court sentenced him to consecutive sentences for each § 924(c)(1) violation. On appeal, Deal argued that the second through sixth § 924(c) convictions were not "second or subsequent" to the first because they had been charged in the same indictment and sentenced at the same time. The Supreme Court rejected this argument, concluding the language

of § 924(c)(1) only requires "a conviction after the first conviction." *Id.* at 135 (emphasis omitted). It does not speak in terms of criminal episodes.

In the wake of *Deal*, at least two courts have rejected the argument Higgs makes here: that multiple consecutive sentences cannot be imposed for § 924(c)(1) convictions arising out of the same criminal episode. *See United States v. Casiano*, 113 F.3d 420, 424-26 (3d Cir. 1997); *United States v. Andrews*, 75 F.3d 552, 557-58 (9th Cir. 1996); *cf United States v. Burnette*, 170 F.3d 567, 572 (6th Cir. 1999) ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode are lawful."); *United States v. Camps*, 32 F.3d 102, 109 (4th Cir. 1994) (holding that enhanced sentences for consecutive § 924(c) convictions arising out of a single predicate offense were not error). Accordingly, we reject Higgs's challenge to the enhanced twenty-year sentences imposed for his second and third § 924(c) convictions.

## VII.   Conclusion

For the foregoing reasons, we find no reversible error with respect to the issues that Jackson has raised on appeal. As set forth above, the evidence clearly supports the jury's special findings of the existence of at least one of the aggravating factors listed in § 3592 for each murder and kidnapping conviction. Having reviewed the entire record in accordance with § 3592(b), we are also satisfied that the sentences of death handed down were not imposed under the influence of passion, prejudice, or any other arbitrary factor. Accordingly, we affirm the convictions and sentences imposed upon Higgs in their entirety.

*AFFIRMED*